[No. S140064. July 23, 2007.]

VIVA! INTERNATIONAL VOICE FOR ANIMALS et al., Plaintiffs and Appellants, v.
ADIDAS PROMOTIONAL RETAIL OPERATIONS, INC., et al., Defendants and Respondents.

930

## Counsel

Eisenberg, Raisman, Thurston & Wong, Orly Degani; and David Blatte for Plaintiffs and Appellants.

Jonathan R. Lovvorn and Rebecca G. Judd for The Humane Society of the United States as Amicus Curiae on behalf of Plaintiffs and Appellants.

Morgenstein & Jubelirer and Bruce A. Wagman for Animal Defense Fund as Amicus Curiae on behalf of Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Thomas Greene, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Clifford T. Lee and Tara L. Mueller, Deputy Attorneys General, for California Department of Fish and Game as Amicus Curiae on behalf of Plaintiffs and Appellants.

Davis Wright Tremaine, Martin L. Fineman and Sam N. Dawood for Defendants and Respondents.

McKenna Long & Aldridge, Ann G. Grimaldi and Eric S. C. Lindstrom for The Government of the Commonwealth of Australia as Amicus Curiae.

OPINION

**WERDEGAR, J.**—State law prohibits the importation into or sale within California of products made from kangaroo. (Pen. Code, § 653o.) Defendant adidas Promotional Retail Operations, Inc., concedes it imports into and sells in California athletic shoes made from kangaroo hide, but argues Penal Code section 653o is preempted because it conflicts with federal policies intended to influence Australian kangaroo management practices. As section 653o poses no obstacle to any current federal policy, we conclude it is not preempted, and we reverse the Court of Appeal's contrary judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The material facts are undisputed. Defendants adidas Promotional Retail Operations, Inc., Sport Chalet, and Offside Soccer (collectively Adidas) are California retailers that sell athletic shoes made from kangaroo leather imported from Australia. Specifically, Adidas sells athletic shoes made from the hides of three kangaroo species: the red kangaroo (*Macropus rufus*), the eastern grey kangaroo (*Macropus giganteus*), and the western grey kangaroo (*Macropus fuliginosus*). Kangaroos are indigenous to Australia and New Guinea; the three species at issue here exist only in Australia.[1]

Plaintiff Viva! International Voice for Animals is an international nonprofit organization devoted to protecting animals. Plaintiff Jerold Friedman is a resident of Los Angeles County. Plaintiffs (collectively Viva) sued Adidas for engaging in an unlawful business practice by importing and selling athletic shoes made from kangaroo leather. (Bus. & Prof. Code, § 17200.) Viva alleged the importation and sale of Adidas's shoes violated Penal Code section 653o, which regulates trade in various animal species, including kangaroos.

Both sides sought summary judgment; the trial court denied Viva's motion and granted Adidas's motion. It agreed with Adidas that Penal Code section 653o was preempted by the Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.) because it undermined federal actions taken under the act to influence the Australian state and federal governments to preserve threatened kangaroo species.

The Court of Appeal affirmed. While acknowledging the preemption question was close, it agreed with the trial court that the "statute as applied to defendants in this case conflicts with federal law and with substantial federal objectives of persuading Australian federal and state governments to impose

---

[1] "Kangaroo" is the common name for the indigenous Australian animal of the scientific superfamily Macropodoidea (or macropods). There are at least 69 species of macropods.

kangaroo population management programs, in exchange for allowing the importation of kangaroo products."

We granted review to resolve this important preemption question.

## Discussion

We begin by noting what we are not called upon to decide. The Commonwealth of Australia is free to manage its indigenous wildlife populations in any manner it sees fit, subject to international treaty obligations. Likewise, California is free to regulate within its own borders unless federal law or the United States Constitution requires otherwise. It is not our role to judge the wisdom of Australia's wildlife management practices, which Adidas and amicus curiae the Government of the Commonwealth of Australia defend and Viva and amicus curiae the Animal Legal Defense Fund criticize, nor the wisdom of California's wildlife rules or the federal government's statutes and regulations. The only question before us is whether California's rules can coexist with federal law.

### I. *Preemption Principles*

■ The supremacy clause of the United States Constitution establishes a constitutional choice-of-law rule, makes federal law paramount, and vests Congress with the power to preempt state law. (U.S. Const., art. VI, cl. 2; *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [120 L.Ed.2d 407, 112 S.Ct. 2608]; *Jevne v. Superior Court* (2005) 35 Cal.4th 935, 949 [28 Cal.Rptr.3d 685, 111 P.3d 954].)[2] There are four species of federal preemption: express, conflict, obstacle, and field. (See *Bronco Wine Co. v. Jolly* (2004) 33 Cal.4th 943, 955 [17 Cal.Rptr.3d 180, 95 P.3d 422].)[3]

---

[2] We note some controversy over the true source of Congress's power to preempt state regulation. (Compare *Gade v. National Solid Wastes Management Assn.* (1992) 505 U.S. 88, 108 [120 L.Ed.2d 73, 112 S.Ct. 2374] [preemption doctrine is "derived" from the supremacy clause], and *Fidelity Federal Sav. & Loan Assn. v. de la Cuesta* (1982) 458 U.S. 141, 152 [73 L.Ed.2d 664, 102 S.Ct. 3014] ["The pre-emption doctrine . . . has its roots in the Supremacy Clause"], with Gardbaum, *Congress's Power to Preempt the States* (2005) 33 Pepperdine L.Rev. 39, 49–51 [arguing that the necessary and proper clause, U.S. Const., art. I, § 8, cl. 18, is the true source of the preemption power], and Dinh, *Reassessing the Law of Preemption* (2000) 88 Geo. L.J. 2085, 2091 [arguing preemption power is pendant to enumerated powers in U.S. Const., art. I, § 8].) While the source of the power may be subject to question, its existence is not.

[3] "[T]he categories of preemption are not 'rigidly distinct.' " (*Crosby v. National Foreign Trade Council* (2000) 530 U.S. 363, 372, fn. 6 [147 L.Ed.2d 352, 120 S.Ct. 2288]; accord, *Peatros v. Bank of America* (2000) 22 Cal.4th 147, 158, fn. 1 [91 Cal.Rptr.2d 659, 990 P.2d 539] (lead opn. of Mosk, J.).) We and the United States Supreme Court have often identified only three species of preemption, grouping conflict preemption and obstacle preemption together in a single category. (See, e.g., *English v. General Electric Co.* (1990) 496 U.S. 72, 78–79

■ First, express preemption arises when Congress "define[s] explicitly the extent to which its enactments pre-empt state law. [Citation.] Pre-emption fundamentally is a question of congressional intent, [citation], and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." (*English v. General Electric Co., supra*, 496 U.S. at pp. 78–79; accord, *Jevne v. Superior Court, supra*, 35 Cal.4th at p. 949.) Second, conflict preemption will be found when simultaneous compliance with both state and federal directives is impossible. (*Hillsborough County v. Automated Medical Labs.* (1985) 471 U.S. 707, 713 [85 L.Ed.2d 714, 105 S.Ct. 2371]; *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 815 [135 Cal.Rptr.2d 1, 69 P.3d 927].) Third, obstacle preemption arises when " 'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (*Crosby v. National Foreign Trade Council, supra*, 530 U.S. at p. 373, quoting *Hines v. Davidowitz* (1941) 312 U.S. 52, 67 [85 L.Ed. 581, 61 S.Ct. 399]; accord, *Bronco Wine Co. v. Jolly, supra*, 33 Cal.4th at p. 955.) Finally, field preemption, i.e., "Congress' intent to pre-empt all state law in a particular area," applies "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." (*Hillsborough County*, at p. 713, quoting *Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [91 L.Ed. 1447, 67 S.Ct. 1146].)

■ " '[C]ourts are reluctant to infer preemption, and it is the burden of the party claiming that Congress intended to preempt state law to prove it.' " (*Olszewski v. Scripps Health, supra*, 30 Cal.4th at p. 815, quoting *Elsworth v. Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 548 [208 Cal.Rptr. 874, 691 P.2d 630]; accord, *Bronco Wine Co. v. Jolly, supra*, 33 Cal.4th at pp. 956–957.)

We consider in turn the state and federal law at issue.

II. *Penal Code Section 653o and Preemption Presumptions*

Penal Code section 653o was enacted in 1970 and expanded to include kangaroos in 1971. (Stats. 1970, ch. 1557, § 1, p. 3186; Stats. 1971, ch. 1283, § 1, pp. 2511–2512.) Subdivision (a) of section 653o provides in relevant part: "It is unlawful to import into this state for commercial purposes, to

---

[110 L.Ed.2d 65, 110 S.Ct. 2270]; *Dowhal v. SmithKline Beecham Consumer Healthcare* (2004) 32 Cal.4th 910, 923 [12 Cal.Rptr.3d 262, 88 P.3d 1].) As conflict and obstacle preemption are analytically distinct and may rest on wholly different sources of constitutional authority, we treat them as separate categories here. (See, e.g., Dinh, *Reassessing the Law of Preemption, supra*, 88 Geo. L.J. at pp. 2102–2105.)

possess with intent to sell, or to sell within the state, the dead body, or any part or product thereof, of any polar bear, leopard, ocelot, tiger, cheetah, jaguar, sable antelope, wolf (Canis lupus), zebra, whale, cobra, python, sea turtle, colobus monkey, *kangaroo*, vicuna, sea otter, free-roaming feral horse, dolphin or porpoise (Delphinidae), Spanish lynx, or elephant." (Italics added.) Section 653o was passed to prevent the extinction of species the Legislature deemed threatened. (*People v. K. Sakai Co.* (1976) 56 Cal.App.3d 531, 536 [128 Cal.Rptr. 536].)

In the trial court and Court of Appeal, Adidas argued unsuccessfully that Penal Code section 653o should be construed as applying only to those species currently *federally* listed as endangered. Each court concluded section 653o's plain language dictated a contrary result, as the statute applies to "any . . . kangaroo" product, without qualification for federal endangered species status. Instead, the statute rests on a legislative judgment that the species listed merit special state concern, without regard to their federal status. Like the Court of Appeal, we agree the plain language of the statute extends its scope to all kangaroos and does not depend on the vicissitudes of federal protection.

Penal Code section 653o addresses an area typically regulated by, and historically within the traditional police powers of, the states—wildlife management.[4] Notwithstanding Adidas's contrary argument, the scope of this power has long been recognized as extending even to regulation of foreign species: "[A] state may constitutionally conserve wildlife elsewhere by refusing to accept local complicity in its destruction. The states' authority to establish local prohibitions with respect to out-of-state wildlife has, since the late nineteenth-century, been recognized by the courts." (*Cresenzi Bird Importers, Inc. v. State of N.Y.* (S.D.N.Y. 1987) 658 F.Supp. 1441, 1447; see *Maine v. Taylor* (1986) 477 U.S. 131, 151–152 [91 L.Ed.2d 110, 106 S.Ct.

---

[4] See *Kleppe v. New Mexico* (1976) 426 U.S. 529, 545 [49 L.Ed.2d 34, 96 S.Ct. 2285] ("the States have broad trustee and police powers over wild animals within their jurisdictions" and " 'may regulate the killing and sale of [wildlife]' "); *Silz v. Hesterberg* (1908) 211 U.S. 31, 39 [53 L.Ed. 75, 29 S.Ct. 10] (state police power extends to wildlife regulation); *Geer v. Connecticut* (1896) 161 U.S. 519, 522–527 [40 L.Ed. 793, 16 S.Ct. 600] (tracing history of governmental power to control private taking of wildlife under Greek, Roman, and English law), overruled on other grounds by *Hughes v. Oklahoma* (1979) 441 U.S. 322 [60 L.Ed.2d 250, 99 S.Ct. 1727]; *Lawton v. Steele* (1894) 152 U.S. 133, 138 [38 L.Ed. 385, 14 S.Ct. 499] ("The preservation of game and fish, however, has always been treated as within the proper domain of the police power"); *People v. K. Sakai Co., supra,* 56 Cal.App.3d at page 536 ("[I]t cannot be argued that the protection of endangered species of wildlife is not within the ambit of the police power"); *DeHart v. Town of Austin, Ind.* (7th Cir. 1994) 39 F.3d 718, 722 ("The regulation of animals has long been recognized as part of the historic police power of the States"); *Nettleton Co. v. Diamond* (1970) 27 N.Y.2d 182 [315 N.Y.S.2d 625, 264 N.E.2d 118, 122] ("[I]t is almost axiomatic that wildlife conservation has been a matter traditionally left to the States").

2440] [upholding import restrictions on out-of-state fish as valid exercise of state police powers]; *Nettleton Co. v. Diamond, supra,* 264 N.E.2d at pp. 121–122 [upholding New York regulation of crocodiles].) This broad power is justified in part by an increased understanding of the deep interconnectedness of the global ecosystem, because " '[i]t is now generally recognized that the destruction or disturbance of vital life cycles or of the balance of a species of wildlife, even though initiated in one part of the world, may have a profound effect upon the health and welfare of people in other distant parts.' " (*People v. K. Sakai Co., supra,* 56 Cal.App.3d at pp. 535–536 [upholding California regulation of whales], quoting *Palladio, Inc. v. Diamond* (S.D.N.Y. 1970) 321 F.Supp. 630, 631, affd. (2d Cir. 1971) 440 F.2d 1319.)

■ There is a presumption against federal preemption in those areas traditionally regulated by the states: "[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." (*Rice v. Santa Fe Elevator Corp., supra,* 331 U.S. at p. 230; accord, *Bates v. Dow Agrosciences LLC* (2005) 544 U.S. 431, 449 [161 L.Ed.2d 687, 125 S.Ct. 1788]; *Bronco Wine Co. v. Jolly, supra,* 33 Cal.4th at p. 974 [in areas of traditional state regulation, a "strong presumption" against preemption applies and state law will not be displaced "unless it is clear and manifest that Congress intended to preempt state law"]; *Olszewski v. Scripps Health, supra,* 30 Cal.4th at p. 815 [presumption against preemption " 'provides assurance that the "federal-state balance" [citation] will not be disturbed unintentionally by Congress or unnecessarily by the courts' "].)

However, Penal Code section 653o and the Endangered Species Act of 1973 also touch on matters implicating foreign affairs. As previously noted, the entire wild kangaroo population is confined to the Commonwealth of Australia and Papua New Guinea, and the three species at issue here exist only in Australia. Additionally, as we shall discuss, the act itself was passed in part to ensure the United States could meet its international conservation treaty obligations. (See 16 U.S.C. § 1531(a)(4), (b).)

In *Crosby v. National Foreign Trade Council, supra,* 530 U.S. 363, the United States Supreme Court addressed an exercise of a state's traditional powers (its spending power) in a manner that touched on foreign affairs. It concluded Massachusetts's policy of not purchasing goods and services from persons doing business with Myanmar (Burma) was preempted by a federal act imposing its own sanctions on Burma. In doing so, the high court elected to "leave for another day a consideration in this context of a presumption against preemption. [Citation.] Assuming, *arguendo,* that some presumption

against preemption is appropriate," the court nevertheless concluded "the state Act presents a sufficient obstacle to the full accomplishment of Congress's objectives under the federal Act to find it preempted." (*Id.* at p. 374, fn. 8.) *Crosby* thus left open the possibility that either no presumption, or a substantially weakened presumption, should apply in such instances.

In *American Ins. Assn. v. Garamendi* (2003) 539 U.S. 396 [156 L.Ed.2d 376, 123 S.Ct. 2374], the United States Supreme Court returned to foreign affairs preemption, this time in the context of a putative conflict between executive agreements reached with various foreign nations and a California law regulating insurers that had issued Holocaust-era insurance policies. The court concluded that under either a field or obstacle preemption analysis the law was preempted. (*Id.* at pp. 419–420.) In the course of its preemption analysis, it neither referenced nor applied any presumptions, instead concluding under neutral analytical principles there was a "clear conflict" between state law and federal policy. (*Id.* at p. 421.)

Taking the most conservative course, we read *Crosby v. National Foreign Trade Council, supra,* 530 U.S. 363, and *American Ins. Assn. v. Garamendi, supra,* 539 U.S. 396, as implying that, where a traditional state exercise of the police power implicates foreign affairs concerns, no particular presumption applies.[5] Instead, we turn to the language of the Endangered Species Act of 1973 and allow the statute's text to guide us under ordinary principles of interpretation. (See Goldsmith, *Statutory Foreign Affairs Preemption* (2000) 2000 Sup. Ct. Rev. 175, 177 ["When a foreign relations statute touches on traditional state prerogatives, both canons are implicated, and both lose coherence. The prudent course is for courts to apply 'ordinary' principles of preemption without any presumption in favor of state or federal law, even when they think the statute concerns foreign affairs"].)

In every preemption analysis, congressional intent is the " 'ultimate touchstone' " (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485 [135 L.Ed.2d 700, 116 S.Ct. 2240]; *Jevne v. Superior Court, supra,* 35 Cal.4th at p. 949) and the statutory text the best indicator of that intent (*Sprietsma v. Mercury Marine* (2002) 537 U.S. 51, 62–63 [154 L.Ed.2d 466, 123 S.Ct. 518]). As a majority of the current United States Supreme Court has agreed at one time or another, "pre-emption analysis is not '[a] freewheeling judicial inquiry into whether a state statute is in tension with federal objectives,' *Gade* v. *National*

---

[5] We need not, and do not, formally decide whether this is so. Even if some form of a presumption against preemption survives these cases in situations touching on foreign affairs, it does not affect the outcome here because, as we shall discuss, even without an antipreemption presumption, we find no basis for preemption.

*Solid Wastes Management Assn.*[, *supra*,] 505 U.S. [at p.] 111 . . . [conc. opn. of Kennedy, J.]), but an inquiry into whether the ordinary meanings of state and federal law conflict." (*Bates v. Dow Agrosciences LLC, supra,* 544 U.S. at p. 459 (conc. & dis. opn. of Thomas, J., joined by Scalia, J.); accord, *Geier v. American Honda Motor Co.* (2000) 529 U.S. 861, 911 [146 L.Ed.2d 914, 120 S.Ct. 1913] (dis. opn. of Stevens, J., joined by Souter, J., Thomas, J., & Ginsburg, J.) ["In my view, however, 'preemption analysis is, or at least should be, a matter of precise statutory [or regulatory] construction rather than an exercise in free-form judicial policymaking' "].)

### III. *The Endangered Species Act of 1973*

Responding to rising national and international concern over the impact of humans on other species, Congress passed the Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.) (Act), at the time "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." (*TVA v. Hill* (1978) 437 U.S. 153, 180 [57 L.Ed.2d 117, 98 S.Ct. 2279].) Congress found that various species of fish, wildlife, and plants in the United States had been rendered extinct or threatened with extinction. (16 U.S.C. § 1531(a)(1), (2); H.R.Rep. No. 93-412, 1st Sess., pp. 1-2 (1973).) It identified as the purposes of the Act "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species," and to effectuate various international conservation treaties and conventions. (16 U.S.C. § 1531(b).) "The plain intent of Congress in enacting [the Act] was to halt and reverse the trend toward species extinction, whatever the cost." (*TVA,* at p. 184.)

States were to play an essential role in species preservation. Congress declared that "encouraging the States . . . through Federal financial assistance and a system of incentives, to develop and maintain conservation programs which meet national and international standards is a key to meeting the Nation's international commitments and to better safeguarding, for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants." (16 U.S.C. § 1531(a)(5).) In section 6 of the Act (16 U.S.C. § 1535 and its subparts), Congress defined precisely the respective roles of the federal and state governments in carrying out these policies. It directed the Secretary of the Interior to "cooperate to the maximum extent practicable with the States." (*Id.,* § 1535(a).) It further authorized management agreements, pursuant to which the state and federal governments would manage conservation areas (*id.,* § 1535(b)), and cooperative agreements, pursuant to which the federal government would assist states in implementing conservation programs (*id.,* § 1535(c)).

The Act's legislative history confirms this vision of a joint cooperative state-federal approach to wildlife preservation. "The Senate believed that a federal wildlife program should not preempt similar state regulation. The committee responsible for the Senate bill reported that '[w]hile the Federal government should protect such species where States have failed to meet minimum Federal standards, it should not preempt efficient programs. Instead[,] it should encourage these, and aid in the extension or establishment of others, to facilitate management by granting regulatory authority and making available financial assistance to approved schemes.' " (*Cresenzi Bird Importers, Inc. v. State of N.Y., supra*, 658 F.Supp. at p. 1444, quoting Sen.Rep. No. 93-307, 1st Sess. (1973), reprinted in 1973 U.S. Code Cong. & Admin. News, pp. 2989, 2991–2992; see also H.R.Rep. No. 93-412, 1st Sess., *supra*, p. 7; Note, *Federal Preemption of State Commerce Bans Under the Endangered Species Act* (1982) 34 Stan. L.Rev. 1323, 1328–1330 [analyzing language and legislative history of the Act and concluding it "expressly anticipates and authorizes concurrent state regulation as a key element of the overall regulatory scheme"].)

With that background in mind, we turn to the Act's key provision for our purposes, section 6(f) of the Act, codified at 16 United States Code section 1535(f) (hereafter section 6(f)),[6] which expressly spells out the intended preemptive scope of the Act: "Any State law or regulation which applies with respect to the importation or exportation of, or interstate or foreign commerce in, endangered species or threatened species is void to the extent that it may effectively (1) *permit what is prohibited* by this chapter or by any regulation which implements this chapter, or (2) *prohibit what is authorized* pursuant to an exemption or permit provided for in this chapter or in any regulation which implements this chapter." (§ 6(f), italics added.) The second half of section 6(f) is a savings clause: "This chapter shall not otherwise be construed to void any State law or regulation which is intended to conserve migratory, resident, or introduced fish or wildlife, or to permit or prohibit sale of such fish or wildlife. Any State law or regulation respecting the taking of an endangered species or threatened species may be more restrictive than the exemptions or permits provided for in this chapter or in any regulation which implements this chapter but not less restrictive than the prohibitions so defined."

■ Various aspects of the express preemption clause and savings clause are significant. First, these provisions continue the cooperative framework

---

[6] Where a statute "contains an express pre-emption clause, our 'task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.' " (*Sprietsma v. Mercury Marine, supra*, 537 U.S. at pp. 62–63, quoting *CSX Transp., Inc. v. Easterwood* (1993) 507 U.S. 658, 664 [123 L.Ed.2d 387, 113 S.Ct. 1732].)

established elsewhere in the Act, under which federal and state regulation should be allowed to coexist to the extent practicable. Where Congress establishes a regime of dual state-federal regulation, "conflict-pre-emption analysis must be applied sensitively . . . so as to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role." (*Northwest Cent. Pipeline v. Kan. Corp. Comm'n* (1989) 489 U.S. 493, 515 [103 L.Ed.2d 509, 109 S.Ct. 1262]; see also *New York Dept. of Social Services v. Dublino* (1973) 413 U.S. 405, 421 [37 L.Ed.2d 688, 93 S.Ct. 2507] ["Where coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one"].)

■ Second, section 6(f) demonstrates a congressional intent to preempt only narrowly. (*Man Hing Ivory and Imports, Inc. v. Deukmejian* (9th Cir. 1983) 702 F.2d 760, 763 [§ 6(f) "allows full implementation of [Penal Code] section 653o so long as the state statute does not prohibit what the federal statute or its implementing regulations permit"]; *Cresenzi Bird Importers, Inc. v. State of N.Y.*, *supra*, 658 F.Supp. at p. 1444 [§ 6(f) "evince[s] a clear Congressional intent to preempt state wildlife conservation laws only to a very limited extent"].) While federal law establishes a regulatory floor for listed (i.e., endangered or threatened) species, "[a]ny State law or regulation respecting the taking of an endangered species or threatened species may be *more restrictive* than the exemptions or permits provided for in this chapter or in any regulation which implements this chapter . . . ." (§ 6(f), italics added; see also *Man Hing Ivory and Imports, Inc.*, at p. 763, fn. 3 [the Act was rewritten to " 'make it clear that the states would and should be free to adopt legislation or regulations that might be more restrictive than that of the Federal government and to enforce the legislation' " (quoting H.R.Rep. No. 93-412, 1st Sess., *supra*, p. 7)]; *Cresenzi Bird Importers, Inc.*, at p. 1444, [" '[S]tate law is not pre-empted, but is merely subject to the Federal "floor" of regulations under the Act' " (quoting H.R.Rep. No. 93-412, *supra*, p. 14)].)

■ Third, with respect to unlisted species, section 6(f) leaves undisturbed the states' broad traditional regulatory authority. The text of the section's savings clause preserves state power to enact more stringent regulations even with respect to threatened and endangered species, those species for which federal concern is greatest. Neither section 6(f)'s preemption clause nor its savings clause mentions any impact on state power over unlisted species; by inference, that power is at least as great or greater than over federally regulated endangered or threatened species.

The legislative history confirms as much. Discussing the effect of section 6(f), the House Committee on Merchant Marine and Fisheries explained: "Existing state endangered species programs would, for example, *be in a position to include species which were not on the Federal list.* . . . [L]aws already passed in States such as New York, California and Hawaii, which *list additional species* or prohibit such activities as sales within their jurisdiction[,] would be unaffected." (H.R.Rep. No. 93-412, 1st Sess., *supra*, p. 14, italics added; *id.* at p. 8 [with one exception, "the State powers to regulate in a more restrictive fashion *or to include additional species* remain unimpaired" (italics added)].)

The federal courts that have interpreted the Act agree. Thus, in *H.J. Justin & Sons, Inc. v. Deukmejian* (9th Cir. 1983) 702 F.2d 758, a boot manufacturer sought preemption of Penal Code section 653o with respect to two unlisted species, including the wallaby kangaroo, and one listed species. The Ninth Circuit found no preemption of section 653o as it applied to unlisted species; because the species were neither endangered nor threatened, "section 6(f) of the Act has no application to state regulations restricting or prohibiting trade in those species." (*H.J. Justin & Sons, Inc.*, at p. 759; see also *Man Hing Ivory and Imports, Inc. v. Deukmejian*, *supra*, 702 F.2d at p. 763, fn. 3 ["[T]he legislative history of the [Act] unequivocally shows that Congress meant for federal law to preempt state law pursuant to the first sentence of section 6(f) only where the species was listed as endangered on the federal list . . ."]; *id.* at p. 765, fn. 4 ["the state is free to prohibit entirely trade in . . . unlisted species"]; *Cresenzi Bird Importers, Inc. v. State of N.Y.*, *supra*, 658 F.Supp. at pp. 1444–1445.)[7]

The only exception to this preservation of state power is for activities specifically authorized by a federal exemption or permit. (§ 6(f) [state may not "prohibit what is authorized pursuant to an exemption or permit"]; H.R.Rep. No. 93-412, 1st Sess., *supra*, p. 14 ["The only exception to [unfettered state power over unlisted species] is contained in the language which expressly prohibits the state from voiding actions specifically permitted by Federal agencies"]; *Man Hing Ivory and Imports, Inc. v. Deukmejian*, *supra*, 702 F.2d at p. 763; see 16 U.S.C. § 1539 [authorizing issuance of federal permits and exemptions].)[8]

---

[7] Adidas dismisses *H.J. Justin & Sons, Inc. v. Deukmejian*, *supra*, 702 F.2d 758, and *Man Hing Ivory and Imports, Inc. v. Deukmejian*, *supra*, 702 F.2d 760, as addressing only express preemption. True enough. But insofar as they construe the scope of section 6(f), and insofar as the scope of section 6(f) is relevant even to an implied preemption analysis (see *post*, pt. IV.A.), the Ninth Circuit's conclusions in these cases are instructive and persuasive.

[8] As well, states may not purport to authorize what federal law forbids, but this exception is not implicated here.

 Section 6(f) does not expressly preempt Penal Code section 653o; the Act does not occupy the field of kangaroo import and sales regulation (see *Jevne v. Superior Court, supra*, 35 Cal.4th at p. 950 [inclusion of savings clause in a statute negates field preemption]); and there is no conflict preemption, as simultaneous compliance with both federal law, which as a floor matter allows kangaroo trade, and state law, which imposes a higher standard and prohibits it, is not a " 'physical impossibility' " (*Hillsborough County v. Automated Medical Labs., supra*, 471 U.S. at p. 713, quoting *Florida Avocado Growers v. Paul* (1963) 373 U.S. 132, 143 [10 L.Ed.2d 248, 83 S.Ct. 1210]). Thus, we consider the interplay of section 6(f) and the Act's implementing regulations with Penal Code section 653o solely in the context of an assertion of obstacle preemption.

## IV. *Obstacle Preemption*

### A. *The Role of an Express Preemption Provision in Implied Preemption Analysis*

We begin with a point overlooked by the Court of Appeal: the central role of the Act's express preemption provision even in implied preemption analysis.

A majority of the United States Supreme Court once suggested that where Congress had enacted an express preemption provision, that provision was the exclusive and final statement of congressional preemptive intent and thus obviated *any* consideration of implied preemption doctrines. (*Cipollone v. Liggett Group, Inc., supra*, 505 U.S. at p. 517; *id.* at pp. 531–532 (conc. & dis. opn. of Blackmun, J.); see also *Medtronic, Inc. v. Lohr, supra*, 518 U.S. at p. 484 ["[T]he pre-emptive language of [the statute] means that we need not go beyond that language to determine whether Congress intended the [statute] to pre-empt at least some state law"].)

 A slightly more tempered view of the force of express preemption provisions has since prevailed. In *Freightliner Corp. v. Myrick* (1995) 514 U.S. 280 [131 L.Ed.2d 385, 115 S.Ct. 1483], the court clarified the relation between express preemption clauses and implied preemption doctrines, explaining that "an express definition of the pre-emptive reach of a statute 'implies'—*i.e.*, supports a reasonable inference—that Congress did not intend to pre-empt other matters," but the express clause does not "entirely foreclose[] any possibility of implied pre-emption." (*Id.* at p. 288; see also *id.* at p. 289 ["*Cipollone* supports an inference that an express pre-emption clause forecloses implied pre-emption; it does not establish a rule"].) This inference is a simple corollary of ordinary statutory interpretation principles and in particular "a variant of the familiar principle of *expressio unius est*

*exclusio alterius*: Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." (*Cipollone v. Liggett Group, Inc., supra*, 505 U.S. at p. 517.) The *Freightliner* view is now well established. (See *Sprietsma v. Mercury Marine, supra*, 537 U.S. at p. 69; *Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 541 [150 L.Ed.2d 532, 121 S.Ct. 2404] ["In these cases, our task is to identify the domain expressly pre-empted, [citation], because 'an express definition of the pre-emptive reach of a statute . . . supports a reasonable inference . . . that Congress did not intend to pre-empt other matters' "]; *Bronco Wine Co. v. Jolly, supra*, 33 Cal.4th at pp. 988–989 [relying on and applying the inference].)

The *Freightliner* inference applies here. Congress has expressly identified the scope of the state law it intends to preempt; hence, we infer Congress intended to preempt no more than that absent sound contrary evidence. Neither *Freightliner* nor any subsequent case has spelled out precisely what force to accord this inference, and we need not do so here. As we shall discuss, Adidas's evidence is insufficient to contradict the inference under any standard.[9]

### B. *Preemption by Nonregulation*

Here, Adidas asserts preemption by nonregulation. In the absence of any positive statutory provision or regulation governing kangaroos, Adidas relies on the history of the federal government's involvement with Australian kangaroo management practices.

The United States Supreme Court has recognized that even the absence of federal regulation may give rise to implied preemption. (*Sprietsma v. Mercury Marine, supra*, 537 U.S. at p. 66; *Freightliner Corp. v. Myrick, supra*, 514 U.S. at p. 286; *Arkansas Elec. Coop. v. Ark. Public Serv. Comm'n* (1983) 461 U.S. 375, 384 [76 L.Ed.2d 1, 103 S.Ct. 1905].) However, preemption in such circumstances is confined to situations " 'where failure of . . . federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute.' " (*Ray v. Atlantic Richfield Co.*

---

[9] We note as well that "Congress has the power to preclude conflict [and obstacle] preemption, allowing states to enforce laws even if those laws are in direct conflict with federal law or frustrate the purpose of federal law" (*Dowhal v. SmithKline Beecham Consumer Healthcare, supra*, 32 Cal.4th at p. 924; see *Geier v. American Honda Motor Co., supra*, 529 U.S. at p. 872), but it did not exercise that power here. Section 6(f) expressly preserves preemption of state law that conflicts with the Act or its enabling regulations and also preempts state law that stands as an obstacle to federal policies, at least insofar as those polices are expressed in a positively adopted permit, exemption, or regulation.

(1978) 435 U.S. 151, 178 [55 L.Ed.2d 179, 98 S.Ct. 988], quoting *Bethlehem Co. v. State Board* (1947) 330 U.S. 767, 774 [91 L.Ed. 1234, 67 S.Ct. 1026].) In essence, Congress or federal authorities may preempt without regulating, but only by affirmatively deciding no state regulation is permitted.

Congress certainly has not done so. Instead, Adidas argues, and the Court of Appeal agreed, that the United States Fish and Wildlife Service's (Fish and Wildlife) historical treatment of red, eastern grey, and western grey kangaroos demonstrates an affirmative intent to create, with respect to these three species, a zone free from state regulation. According to Adidas, that history shows Fish and Wildlife has adopted a "carrot and stick" approach, offering the threat of a ban on imports as a stick and access to United States markets as a carrot to induce Australian state and federal governments to conserve kangaroos. Thus, Adidas reasons, Penal Code section 653o's ban stands as an obstacle to federal policy by diminishing the size of the carrot Fish and Wildlife can offer.

We examine the regulatory history mindful of the fact this is an area where Congress expressly contemplated a cooperative system of state and federal regulation, and where preemption analysis must remain sensitive to preserving the respective state and federal roles. (*Northwest Cent. Pipeline v. Kan. Corp. Comm'n, supra,* 489 U.S. at pp. 514–515.) As well, we are especially reluctant to infer obstacle preemption based on agency actions as opposed to statute. (*Bronco Wine Co. v. Jolly, supra,* 33 Cal.4th at p. 992.) Thus, Adidas must show in the history it relies on an " 'authoritative' message of a federal policy against" state regulation (*Sprietsma v. Mercury Marine, supra,* 537 U.S. at p. 67) and "clear evidence of a conflict" between state and federal goals (*Geier v. American Honda Motor Co., supra,* 529 U.S. at p. 885).

### C. *Federal Regulation—and Deregulation—of Kangaroos*

The parties do not dispute the outline of Fish and Wildlife's treatment of kangaroos as recited by the Court of Appeal and reflected in the Federal Register. We draw from these sources in describing that history.

In the 20th century, a commercial market developed in Australia for kangaroo hides and meat. By the early 1970's, the kangaroo population had dropped to the point that the Australian state and federal governments instituted protective measures such as a ban on exports and species-specific quotas on the killing of kangaroos for commercial use. (39 Fed.Reg. 11903 (Apr. 1, 1974); 45 Fed.Reg. 40958–40959 (June 16, 1980).)

In April 1974, Fish and Wildlife proposed listing the red, eastern grey, and western grey kangaroo as endangered species under the Act.[10] (39 Fed.Reg. 11903 (Apr. 1, 1974); 45 Fed.Reg. 40958 (June 16, 1980).) In December 1974, after receiving public input and further considering the Act's criteria, Fish and Wildlife instead listed these three species as threatened.[11] (39 Fed.Reg. 44990 (Dec. 30, 1974); 45 Fed.Reg. 40959 (June 16, 1980).) Such a listing carries with it a prohibition on importation of the species, subject to exemptions or permits issued under the Act. (16 U.S.C. §§ 1538, 1539; 50 C.F.R. §§ 17.21(b), 17.31(a) (2007).) Fish and Wildlife thereafter formally banned commercial importation of the three species, as well as their body parts and products made from the bodies of the species. (45 Fed.Reg. 40959 (June 16, 1980); 60 Fed.Reg. 12887, 12888 (Mar. 9, 1995).) The ban was to remain in place until those Australian states commercially harvesting the three species "could assure the United States that they had effective management plans for the kangaroos, and that taking would not be detrimental to the survival of kangaroos." (60 Fed.Reg. 12887, 12905 (Mar. 9, 1995); see 16 U.S.C. § 1533(d) [authorizing special species regulations]; 50 C.F.R. §§ 17.21(b), 17.31(a) (2007) [import restrictions apply absent special regulation].)

In 1979, consistent with a provision of the Act requiring periodic reappraisal (16 U.S.C. § 1533(c)(2)), Fish and Wildlife revisited the listing of these kangaroo species. (45 Fed.Reg. 40959 (June 16, 1980).) It found all three remained threatened "because of the susceptibility of these animals to overexploitation and because of the difficulty in predicting the severity and damage that might be caused by natural or man-made factors affecting them" (46 Fed.Reg. 23929 (Apr. 29, 1981)), but concluded the four states commercially harvesting kangaroo—Queensland, New South Wales, South Australia, and Western Australia—had adopted effective management plans and commercial killing within the limits the plans established would "not be detrimental to the survival of the species." (*Ibid.*) On that basis, in April 1981 Fish and Wildlife issued a special final rule, subject to reevaluation after two years, lifting the ban on commercial importation into the United States of products made from the red, eastern grey, and western grey kangaroos. (*Ibid.*; former 50 C.F.R. § 17.40(a)(1)(i)(B) (repealed by 60 Fed.Reg. 12887, 12906 (Mar. 9, 1995)).)

---

[10] An endangered species is one "in danger of extinction throughout all or a significant portion of its range." (16 U.S.C. § 1532(6).)

[11] A threatened species is one "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." (16 U.S.C. § 1532(20).) Listing as a threatened or endangered species depends on consideration of threatened habitat loss, commercial or other overuse, disease, predation, the lack of adequate protective regulatory mechanisms, and any other factor affecting continued existence. (*Id.*, § 1533(a)(1); 50 C.F.R. § 424.11(c) (2007).)

In 1983, Fish and Wildlife reviewed the situation and elected to continue allowing commercial importation. (48 Fed.Reg. 34757 (Aug. 1, 1983).) It also proposed delisting the three kangaroo species. (48 Fed.Reg. 15428 (Apr. 8, 1983); 60 Fed.Reg. 12887, 12888 (Mar. 9, 1995).) Subsequently, however, new data from the Australian government showed the severe drought of the summer of 1982–1983 had significantly depleted kangaroo populations. As a result, Fish and Wildlife withdrew its proposal to delist the species. (49 Fed.Reg. 17555 (Apr. 24, 1984); 60 Fed.Reg. 12887, 12888 (Mar. 9, 1995).)

In December 1989, Greenpeace USA, with support from other groups, petitioned Fish and Wildlife to reinstate the ban on importing the three kangaroo species and their body parts and products. The petitioners argued that Australia's kangaroo management "was inherently flawed and that Australian States did not have adequate and effective conservation programs that ensured the protection of the threatened species." (60 Fed.Reg. 12887, 12888 (Mar. 9, 1995).) In response, Fish and Wildlife sent representatives to Australia to evaluate both population levels and the Australian states' implementation of their management programs and to prepare a report (the Nichols report). (60 Fed.Reg. 12887, 12888 (Mar. 9, 1995).)

Fish and Wildlife thereafter published a notice announcing receipt of Greenpeace USA's petition and the availability of the Nichols report and seeking public comment. The Wildlife Legislative Fund of America (Fund) petitioned Fish and Wildlife to remove the three kangaroo species from the Act's list of threatened species. Relying on the Nichols report, the Fund stressed two grounds to delist the species: (1) by "conservative estimates" the population of the three species totaled almost 14 million; and (2) "kangaroo conservation programs exist within individual range states . . . ." (60 Fed.Reg. 12887, 12888 (Mar. 9, 1995).)

After soliciting further comment, Fish and Wildlife published a proposed rule delisting the three kangaroo species. (58 Fed.Reg. 5341 (Jan. 21, 1993).) Fish and Wildlife found the four Australian states "had developed and implemented adequate and effective conservation programs that ensured the protection of these species[,] . . . kangaroo populations were high[,] . . . the three species were protected by appropriate legislation, [they] had their populations regularly monitored by direct and indirect procedures, and [they] were managed by a complex licensing system which regulated the extent of the legal harvest." (60 Fed.Reg. 12887, 12888 (Mar. 9, 1995).)

In March 1995, Fish and Wildlife removed the three kangaroo species from the Act's list of endangered or threatened species. (60 Fed.Reg. 12887, 12888 (Mar. 9, 1995).) It "delist[ed] these three species of kangaroos on the basis of

their successful recovery because the best scientific and commercial information available indicates the species are now not likely to become an endangered species in the foreseeable future throughout all or a significant part of [their] range." (60 Fed.Reg. 12887, 12904 (Mar. 9, 1995); see 50 C.F.R. § 424.11(d)(2) (2007) [authorizing delisting where a species has recovered].) It characterized the red, eastern grey, and western grey populations as "abundant." (60 Fed.Reg. 12887, 12889 (Mar. 9, 1995).) It simultaneously rescinded the special rule allowing kangaroo importation (former 50 C.F.R. § 17.40(a)(1)(i)(B), repealed Mar. 9, 1995, 60 Fed.Reg. 12887, 12906 (Mar. 9, 1995)) and dismissed Greenpeace USA's petition on procedural grounds; as Fish and Wildlife explained, it had "no mechanism to reimpose an import ban on these non-endangered, non-threatened species" (60 Fed.Reg. 12887, 12904 (Mar. 9, 1995)). As required by the Act, Fish and Wildlife also indicated it would monitor species populations for at least five years. (60 Fed.Reg. 12887, 12904–12905; see 16 U.S.C. § 1533(g)(1).)

Today, the Australian government permits the commercial use of kangaroos and the exportation of kangaroo leather and meat, subject to quotas and other government regulation. According to amicus curiae the Government of the Commonwealth of Australia, the 2005 population of red, eastern grey, and western grey kangaroos was just under 25 million. The Australian government still considers some species threatened or endangered, but not the species at issue here.[12]

The parties agree that since the three species have been delisted under the Act, their importation into the United States is not prohibited by federal law. (See 16 U.S.C. § 1538(a)(1)(A); 50 C.F.R. §§ 17.21(b), 17.31(a) [import ban applies to listed species]; 60 Fed.Reg. 12887, 12888, 12906 (Mar. 9, 1995).)

D. *Analysis*

This history does not establish any "authoritative" policy against state regulation. Fish and Wildlife listed the red, eastern grey, and western grey kangaroo in 1974 based solely on the ecological considerations contained in the Act. (39 Fed.Reg. 44990 (Dec. 30, 1974); 45 Fed.Reg. 40958–40959 (June 16, 1980); see 16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(c) (2007).) It thereafter reconsidered and retained that listed status, again based solely on

---

[12] At oral argument, Adidas noted that one subspecies of eastern grey kangaroo located only on Tasmania, the forester kangaroo (*Macropus giganteus tasmaniensis*), remains endangered. (See 50 C.F.R. § 17.11(h) (2007); 60 Fed.Reg. 12887, 12906 (Mar. 9, 1995).) But in its separate statement of undisputed facts, Adidas asserted that it does not make its footwear from federally listed endangered species, and Viva did not contend otherwise in response. Hence, importation of forester kangaroo products is not at issue, and we need not address preemption as it relates to that subspecies.

the ecological considerations in the Act. (49 Fed.Reg. 17555 (Apr. 24, 1984); 60 Fed.Reg. 12887, 12888 (Mar. 9, 1995).) Finally, it delisted these species in 1995, not as a "carrot" for Australia, in Adidas's and the Court of Appeal's carrot-and-stick metaphor, but because the three species had, in Fish and Wildlife's eyes, recovered. (60 Fed.Reg. 12887, 12904 (Mar. 9, 1995) ["The [Agency], with this action, delists these three species of kangaroos on the basis of their *successful recovery* because the best scientific and commercial information available indicates the species are now not likely to become an endangered species in the foreseeable future throughout all or a significant part of [their] range" (italics added)]; see also *id.* at p. 12889.) In short, these species of kangaroos were delisted because they received a clean bill of health.

Nor is there authoritative evidence that there exists *today* a federal kangaroo policy implemented by Fish and Wildlife to which Penal Code section 653o would stand as an obstacle. Delisting brought to an end federal regulation; Fish and Wildlife rescinded the special rule governing importation. There is no current federal concern.[13] So long as kangaroo populations remain healthy, Fish and Wildlife possesses neither carrots nor sticks, because it cannot regulate species that do not meet the Act's ecological requirements for threatened or endangered status.[14] But the termination of regulation, because *federal* goals have been met, does not preempt further state efforts; instead, it leaves the field open for states to act as they individually see fit.

---

[13] As amicus curiae the Government of the Commonwealth of Australia confirms, the "Australian Government has not received any approach from the United States Government that would suggest that the United States considers non-CITES listed kangaroos to be endangered or at risk of becoming endangered." The three species at issue here are not listed as endangered under CITES, the Convention on International Trade in Endangered Species of Wild Fauna and Flora, March 3, 1973 (27 U.S.T. 1087, T.I.A.S. No. 8249).

[14] Fish and Wildlife explained as much at the time of delisting. A commentator arguing for continued listing asserted: "The 'threatened' listing was valuable because it allowed [Fish and Wildlife] to act as an international watchdog on the kangaroo industry." Fish and Wildlife replied: "[Fish and Wildlife] promotes the international conservation of species and the international enhancement of biodiversity. [Fish and Wildlife] is obligated to properly classify these species based on the criteria stipulated in the Act." (60 Fed.Reg. 12887, 12890 (Mar. 9, 1995); see also *id.* at p. 12889 [Fish and Wildlife "disagrees that threatened status should be retained for these abundant and sufficiently managed species, at this time, to ensure that a primary industry behaves or because one day the threatened status may somehow be useful in the management of kangaroos. [Fish and Wildlife] believes the lists of endangered and threatened species should only include those animals and plants whose current status fit the definitions of the Act"].) In other words, Fish and Wildlife could not use its power to list or delist as a tool of international leverage; it was constrained to obey the terms of the Act, which confined listing criteria to specified ecological considerations. Nowhere in the delisting decision did Fish and Wildlife express any intent that states be excluded from regulating on a going-forward basis. (See *Bronco Wine Co. v. Jolly, supra,* 33 Cal.4th at p. 992 [" '[W]e can expect that [federal agencies] will make their intentions clear if they intend for their regulations to be exclusive.' "] quoting *Hillsborough County v. Automated Medical Labs., supra,* 471 U.S. at p. 718, italics omitted)].)

The Court of Appeal found significant Fish and Wildlife's 1974 imposition of an import ban on kangaroo products, subject to development of Australian species management plans, and its 1981 decision to lift the import ban, as reflective of a then extant policy to persuade the Australian federal and state governments to change their kangaroo management practices. Fish and Wildlife's actions may well have reflected such a policy (see *Defenders of Wildlife, Inc. v. Watt* (D.D.C. 1981) 1981 U.S.Dist. Lexis 18548, at pp. *6–*9 [discussing purported reasons behind Fish and Wildlife's actions]), and were we presented with this preemption question 20 years ago, we might have found these actions similarly significant.[15] Today, however, they have no relevance. Species management plans have been adopted; the three species have recovered; the special rule allowing imports has been rescinded; the species are no longer the subject of ongoing federal regulation; and the Government of the Commonwealth of Australia professes to have, and Fish and Wildlife believes it sincerely has, an independent, strong, ongoing interest in species conservation and in preservation of a national symbol. (60 Fed.Reg. 12887, 12889 (Mar. 9, 1995) [Fish and Wildlife "believes that the Commonwealth and State governments in Australia have a sincere interest in the preservation of their native wildlife species and act in a professional manner to manage these kangaroo species so they will occur in abundance into perpetuity. [Fish and Wildlife] has no reason to believe that market pressures will one day insidiously drive conservation activities in Australia, and notes that the United States and the international community could act to limit the trade in kangaroo products, should the status of these three kangaroo species be significantly reduced in the future"].) Fish and Wildlife's actions in 1974 and 1981 do not demonstrate any *current* policy that states must be excluded from regulating.

The Court of Appeal also found it significant that after delisting, Fish and Wildlife would continue to monitor the three kangaroo species' status and could invoke emergency listing procedures if necessary. However, these are simply inherent features of the Act; monitoring is mandatory for all delisted species, and the emergency listing procedures apply to all unlisted species, period. (See 16 U.S.C. § 1533(b)(7), (g)(2) [emergency listing procedures], (g)(1) [monitoring of delisted species].)[16] They do not imply a policy that states must refrain from regulating such species. Moreover, a reading of these provisions as implying any such policy would be at odds with section 6(f), which in describing the scope of the Act's intended preemptive effect left

---

[15] Or not. Even in 1983, when Fish and Wildlife extended the lifting of the import ban, it recognized "[t]he U.S. market has been small (less than 5 percent of total exported), and has had no effect on kangaroo populations or kill quotas." (48 Fed.Reg. 34757 (Aug. 1, 1983).) Thus, even then one state's import ban may have posed no obstacle to Fish and Wildlife's overall conservation goals.

[16] Monitoring in this context primarily involves the passive receipt and review of reports from the Australian government. (60 Fed.Reg. 12887, 12904–12905 (Mar. 9, 1995).)

undisturbed the states' broad regulatory authority over unlisted species, and would effectively create field preemption for delisted or unlisted species, in contravention of the narrow preemption Congress intended. To the contrary, such species are outside significant present federal concern and, so long as they remain unlisted, are left exclusively to state regulation. (See *Man Hing Ivory and Imports, Inc. v. Deukmejian, supra*, 702 F.2d at p. 765, fn. 4 ["the state is free to prohibit entirely trade in . . . unlisted species"]; *H.J. Justin & Sons, Inc. v. Deukmejian, supra*, 702 F.2d at p. 759 [holding the Act does not preempt Pen. Code, § 653o's import ban as applied to unlisted kangaroos].)

 In the end, Adidas's preemption argument rests on the assertion that Penal Code section 653o is an obstacle to federal law because the current state of federal law allows kangaroo trade. Not so. The key here is the meaning of the word "authorized" in section 6(f).[17] The trial court and Court of Appeal viewed a "failure to prohibit" as equivalent to "authorization." But if that were so, there would be no room for state regulation, despite an evident federal intention that there be significant room for such regulation. Either an action would be prohibited by federal law, in which case state regulation would be superfluous, or it would not be prohibited by federal law, in which case state regulation would be preempted (in these courts' views). The express language and legislative history of section 6(f) preclude this reading. Instead, every action falls within one of three possible federal categories. An action may be prohibited, it may be authorized, or it may be neither prohibited nor authorized. Within this last gray category of actions—a category that at present includes the import of products made from these three kangaroo species—section 6(f) grants states free room to regulate.

 This case is analogous to *Bronco Wine Co. v. Jolly, supra*, 33 Cal.4th 943. There, as here, the party arguing preemption contended that state law prohibited what federal law authorized and was therefore preempted. (*Id.* at p. 992.) As we explained in rejecting this argument, " '[t]here is a difference between (1) not making an activity unlawful, and (2) making that activity lawful.' In our view it is more accurate to characterize the state statute as prohibiting . . . what the federal [regulation] *does not prohibit*." (*Ibid.*, quoting *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 183 [83 Cal.Rptr.2d 548, 973 P.2d 527].) So too here: federal law does not prohibit importation of kangaroo products, while state law does. That arrangement poses no obstacle to current federal policy.

---

[17] States may not "prohibit what is authorized pursuant to an exemption or permit provided for in this chapter or in any regulation which implements this chapter." (§ 6(f).)

## Disposition

The Court of Appeal's judgment is reversed, and this case is remanded to allow the Court of Appeal to address Adidas's remaining claims.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.