SIMONS, J.
*109 *1209 Nanette Sheree Dillard and Paul Daniels appeal their convictions, following a jury trial, of crimes related to their work at an anti-poverty *1210 agency, the Associated Community Action Program (ACAP or the Agency). We conclude two of appellants' convictions were preempted by federal law and reverse these convictions. We otherwise affirm.
PROCEDURAL BACKGROUND
Dillard and Daniels were charged by amended information with the following:
Count 1: Conspiracy to commit grant theft by false pretenses ( Pen. Code, §§ 182, subd. (a)(1), 487, subd. (a) )[1] , with overt acts of drafting, signing, and delivering a letter to the United States Department of Health and Human Services (HHS) "falsely attesting" that ACAP had more than $426,000 in " 'non-federal match funds' " in a Citibank account, and sending a draft of such a letter to a Citibank manager.
Count 2: Grand theft by false pretenses ( § 487, subd. (a) ) by unlawfully taking grant funds from HHS. This count included an allegation that the property taken exceeded $200,000 (§ 12022.6, subd. (a)(2) ).
Count 3: Making a false account of public moneys (§ 424, subd. (a)(3) ) by signing and sending false and inaccurate letters to HHS. A third co-defendant, Vivian Rahwanji, was also charged with this count. Rahwanji entered into a plea agreement with the People on the eve of trial and, as part of this agreement, testified as a prosecution witness.
Count 4: Using public moneys for a purpose not authorized by law (§ 424, subd. (a)(2) ), by improperly using over $280,000 of funds intended for a HHS grant program to fund Agency payroll and other Agency expenses.
In addition, Dillard was charged with the following:
Count 5: Appropriating public moneys to her own use (§ 424, subd. (a)(1) ), by instructing employees to work on her personal residence at below-market rates and obtaining reimbursement for improper business expenses, such as massages and expensive meals.
Count 6: Preparing false and ante-dated documentary evidence (§ 134), by preparing a memoranda regarding the residency status of Agency clients and an agenda of a seminar at a hotel.
Following a lengthy trial, the jury convicted appellants of theft by false pretenses (count 2) and making a false account of public moneys (count 3), *1211 and convicted Dillard of preparing false documentary evidence (count 6). The jury acquitted appellants on all remaining counts. *110 FACTUAL BACKGROUND
The Agency
ACAP was an anti-poverty agency created pursuant to a joint powers agreement between Alameda County (the County) and several cities in the County. A governing board (the Board) consisted of representatives from each of the municipalities and, among other powers, selected the Agency's executive director. Dillard was appointed the Agency's interim executive director in 2004 and its executive director in 2005. Daniels was hired as an administrative assistant at the Agency in 2004, and was promoted to grants manager the following year. Daniels and Dillard married in 2007.
The Assets for Independence Grant Program
In June 2005, the Agency sought, and was awarded, a five-year, $500,000 Assets for Independence (AFI) grant from HHS. Two HHS employees testified about the rules governing AFI grants: Katrina Morgan, an HHS grants management officer, and Anne Yeoman, a 10-year contract employee with HHS who worked primarily on the AFI program. AFI grants are awarded to organizations or agencies to fund programs that help low-income people build assets. We will refer to the organizations or agencies administering the AFI programs as "grantees," and the low-income individuals served by these programs as "savers." In an AFI program, savers deposit money in a designated individual bank account. These deposits are matched with federal AFI grant funds and an equal amount of nonfederal funds. The matched deposits can be withdrawn for approved uses, including higher education, starting a business, or buying a house.
Grantees do not receive the federal AFI money when the grant is awarded. Instead, during the five-year grant period, grantees periodically "drawdown" some or all of the federal grant funds into a dedicated bank account maintained by the grantee, called the reserve account. A grantee can only drawdown federal funds for which it has an equal amount of nonfederal funds on deposit, referred to as "matching nonfederal funds." Before each drawdown, grantees must submit to HHS a letter requesting the drawdown and a letter from the bank holding the reserve fund confirming the presence of matching nonfederal funds in that account. AFI federal grant funds must be drawn down into the reserve account within the five-year grant period, and the distribution of grant funds to savers must be completed by the end of an additional year. Grantees can spend no more than 15 percent of the drawn *1212 down federal AFI funds on program administration; the remainder must be used to match saver deposits. HHS provides grantees with an "AFI Grantee Handbook," an AFI resource center available to answer grantee questions by phone or email, and in-person trainings at grantee conferences.
The Agency's Drawdowns of Federal AFI Grant Funds
The Agency's AFI reserve account, and the hundreds of individual saver deposit accounts participating in the Agency's AFI program, were held at a Citibank branch. The reserve account was the "umbrella" account, and the individual saver accounts were attached to the reserve account. Vivian Rahwanji was the manager of that Citibank branch. Dillard was the sole signatory on the AFI reserve account, and both she and Daniels had access to the AFI account records.
The Agency's five-year AFI grant period ended on June 14, 2010; this date was the last day the Agency could drawdown federal AFI funds. As of the beginning of that month, the Agency had drawn down *111 less than $75,000 out of the $500,000 available federal AFI funds. On June 10, although the Agency only had approximately $47,000 in its AFI reserve account, Daniels emailed Rahwanji a template letter to HHS stating the Agency had $426,874.44 of "non-federal match funds" on deposit in its AFI reserve account and requested she "place the letter on Citibank stationary [and] sign it."[2] Rahwanji did so. Daniels sent the Citibank letter to HHS and HHS transferred the requested federal AFI grant funds to the Agency's reserve account. The prosecution argued this letter was the basis for the theft by false pretenses and false account of public moneys counts (counts 2 and 3)-even though the letter was signed by Rahwanji, the People argued appellants prepared the letter knowing Rahwanji would "rubber-stamp" it and/or aided and abetted her act.[3]
Events Following the June 2010 Drawdown
In August of 2010, the Agency did not have enough funds to meet payroll and AFI federal grant funds were used for this purpose. By February 1, 2011, approximately $280,000 of the federal AFI funds had been used for payroll and approximately $40,000 had been transferred to an Agency "petty cash"
*1213 account.[4] The People confirmed in closing statements that they were not alleging appellants used AFI funds for their own personal use.
On February 2, 2011, the Board placed Dillard on administrative leave. Both appellants were subsequently terminated.
Following appellants' termination, an independent audit determined the Agency was in financial disarray and the Board decided to dissolve it. The interim executive director in charge of overseeing the Agency's dissolution determined that out of the nearly $500,000 in drawn down federal AFI funds, the Agency either lacked nonfederal matching funds for or had used for non-AFI purposes approximately $435,000. The County informed HHS of this and HHS demanded the Agency return these funds. The Agency had approximately $117,000 left in the AFI reserve account and this amount was paid back to the federal government, leaving a remaining liability of approximately $317,000.
Facts Relevant to Count 6 (Preparing False Documentary Evidence)
Count 6 alleged Dillard prepared two ante-dated documents. The first related to reimbursed expenses. On August 26, 2010, Dillard paid for meals, drinks, and massages for herself and the Agency's deputy director at a local hotel and spa, and was subsequently reimbursed by the Agency for these expenses. On February 3, 2011, the day after she was placed on administrative leave, Dillard emailed her assistant asking for "copies of all my expenses that have been submitted." The following day, *112 Dillard emailed her assistant a document purporting to be an "agenda" for an "ACAP Organizational Management" seminar held on August 26, 2010 at the hotel where the expenses had been incurred. Dillard's email asked her assistant to "[p]lease attach to expenses." Her assistant, who made all the arrangements for the hotel visit, had never seen the agenda before. The deputy director testified that several aspects of the agenda did not accurately represent what happened that day.
The second document related to an Agency program called CREW, which provided job training and employment to eligible participants living in the County. Dillard's nephew and his friend were participants in the CREW program but their June 2010 Agency paperwork stated they lived outside the County. In February 2011, the day after Dillard was placed on administrative leave, she emailed her assistant asking if she could "get a hold of the client *1214 files for [her nephew and his friend]? I would like to review them in order to prepare any defense I might need. [¶] Please do not hesitate if anything I request makes you uncomfortable." The following day, Dillard emailed her assistant memoranda dated June 16, 2010 stating Dillard's nephew and his friend were homeless but staying within the County. The email asked her assistant to "[p]lease file in client files," a reference to the CREW participant files.
Dillard admitted both documents were prepared after the fact and ante-dated, but claimed they were recreations of contemporaneously-prepared documents.
DISCUSSION
I. Preemption
Appellants argue the prosecutions of counts 2 and 3-theft by false pretenses and false accounting of public moneys, both based on the representation to HHS that the Agency had matching nonfederal funds in its AFI reserve account-were preempted by federal law. We agree.
A. Legal Standard
" 'The supremacy clause of the United States Constitution establishes a constitutional choice-of-law rule, makes federal law paramount, and vests Congress with the power to preempt state law.' [Citations.] ... Preemption is foremost a question of congressional intent: did Congress, expressly or implicitly, seek to displace state law? [Citations.] [¶] We have identified several species of preemption. Congress may expressly preempt state law through an explicit preemption clause, or courts may imply preemption under the field, conflict, or obstacle preemption doctrines.[5 ][Citations.] ... The burden is on ... the party asserting preemption[ ] to demonstrate [one of these species of preemption] applies." ( Quesada v. Herb Thyme Farms, Inc. (2015) 62 Cal.4th 298, 307-308, 195 Cal.Rptr.3d 505, 361 P.3d 868 ( Quesada ).)
Appellants do not identify any explicit preemption clause, nor do they contend conflict preemption-present "when simultaneous compliance with *1215 both state and federal directives is impossible" ( *113 Viva!, supra, 41 Cal.4th at p. 936, 63 Cal.Rptr.3d 50, 162 P.3d 569 )-applies. Appellants rely in part on field preemption, which "applies 'where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation.' " ( Ibid. ) However, as will be shown below, the federal laws and regulations governing the AFI program are "not so complex or comprehensive that it may be inferred Congress intended to occupy the field." ( In re Jose C. (2009) 45 Cal.4th 534, 553, 87 Cal.Rptr.3d 674, 198 P.3d 1087.)
We focus instead on appellants' obstacle preemption argument. "Obstacle preemption permits courts to strike state law that stands as 'an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citations.] It requires proof Congress had particular purposes and objectives in mind, a demonstration that leaving state law in place would compromise those objectives, and reason to discount the possibility the Congress that enacted the legislation was aware of the background tapestry of state law and content to let that law remain as it was. Ultimately, 'what constitutes a "sufficient obstacle [for a finding of implied preemption] is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." ' " ( Quesada, supra, 62 Cal.4th at p. 312, 195 Cal.Rptr.3d 505, 361 P.3d 868.)
One of the primary cases relied on by appellants is Buckman Co. v. Plaintiffs' Leg. Com. (2001) 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 ( Buckman ). In Buckman, the plaintiffs claimed to be injured by a medical device and brought a state law tort lawsuit against a consultant to the device's manufacturer. ( Id. at p. 343, 121 S.Ct. 1012.) The plaintiffs claimed the consultant "made fraudulent representations to the Food and Drug Administration (FDA or Administration) in the course of obtaining approval to market the [devices]" and, "[h]ad the representations not been made, the FDA would not have approved the devices, and plaintiffs would not have been injured." ( Ibid. )
The high court discussed the federal statutory scheme governing medical devices, set forth in the Federal Food, Drug, and Cosmetic Act (FDCA), 52 Stat. 1040, as amended by the Medical Device Amendments of 1976 (MDA), 90 Stat. 539, 21 United States Code section 301. ( Buckman, supra, 531 U.S. at p. 344, 121 S.Ct. 1012.) Devices which " 'presen[t] a potential unreasonable risk of illness or injury,' " like the one at issue in that case, "must complete a thorough review process with the FDA before they may be marketed." ( Ibid. ) However, "devices that were already on the market prior to the MDA's enactment in 1976" and any " 'substantially equivalent' " devices may seek an exception to this review process whereby they "remain available until the FDA initiates *1216 and completes the [review] process." ( Id. at p. 345, 121 S.Ct. 1012.) Manufacturers applying for this exception, referred to as the " '§ 510(k) process,' " must submit certain information to the FDA, including the intended use for the device. ( Ibid. ) The plaintiffs contended that the defendant's successful section 510(k) application fraudulently represented the intended use of the device. ( Id. at pp. 346-347, 121 S.Ct. 1012.)
Buckman first considered whether there was a presumption against preemption: "Policing fraud against federal agencies is hardly 'a field which the States have traditionally occupied' [citation], such as to warrant a presumption against finding federal pre-emption of a state-law cause of action. To the contrary, the relationship between a federal agency and the entity it regulates is inherently federal in character because *114 the relationship originates from, is governed by, and terminates according to federal law. [Citation.] Here, petitioner's dealings with the FDA were prompted by the MDA, and the very subject matter of petitioner's statements were dictated by that statute's provisions. Accordingly-and in contrast to situations implicating 'federalism concerns and the historic primacy of state regulation of matters of health and safety,' [citation]-no presumption against pre-emption obtains in this case." ( Buckman, supra, 531 U.S. at pp. 347-348, 121 S.Ct. 1012.)
Buckman concluded the plaintiffs' claims were preempted because "the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration, and that this authority is used by the Administration to achieve a somewhat delicate balance of statutory objectives. The balance sought by the Administration can be skewed by allowing fraud-on-the-FDA claims under state tort law." ( Id. at p. 348, 121 S.Ct. 1012.) The court highlighted the existence of statutory and regulatory "provisions aimed at detecting, deterring, and punishing false statements made during this and related approval processes. The FDA is empowered to investigate suspected fraud [citations], and citizens may report wrongdoing and petition the agency to take action [citation]. In addition to the general criminal proscription on making false statements to the Federal Government [citation], the FDA may respond to fraud by seeking injunctive relief [citation], and civil penalties [citation]; seizing the device [citation]; and pursuing criminal prosecutions [citation]. The FDA thus has at its disposal a variety of enforcement options that allow it to make a measured response to suspected fraud upon the Administration. [¶] This flexibility is a critical component of the statutory and regulatory framework under which the FDA pursues difficult (and often competing) objectives." ( Buckman, supra, 531 U.S. at p. 349, 121 S.Ct. 1012, fns. omitted.) For example, the FDA must "ensure both that medical devices are reasonably safe and effective and that, if the device qualifies under the § 510(k) exception, it is on the market within a relatively short period of time," and must "regulat[e] the marketing and distribution of medical devices without intruding upon decisions statutorily committed to the discretion of *1217 health care professionals," such as the off-label use of a medical device. ( Id. at pp. 349-350, 121 S.Ct. 1012.)
The court continued: "State-law fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives. As a practical matter, complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes will dramatically increase the burdens facing potential applicants-burdens not contemplated by Congress in enacting the FDCA and the MDA. Would-be applicants may be discouraged from seeking § 510(k) approval of devices with potentially beneficial off-label uses for fear that such use might expose the manufacturer or its associates (such as petitioner) to unpredictable civil liability. ... [¶] Conversely, fraud-on-the-FDA claims would also cause applicants to fear that their disclosures to the FDA, although deemed appropriate by the Administration, will later be judged insufficient in state court. Applicants would then have an incentive to submit a deluge of information that the Administration neither wants nor needs, resulting in additional burdens on the FDA's evaluation of an application." ( Buckman, supra, 531 U.S. at pp. 350-351, 121 S.Ct. 1012.) The court emphasized the fact that the plaintiffs' "fraud claims exist solely by virtue of the FDCA disclosure requirements. ... [¶] In sum, were plaintiffs *115 to maintain their fraud-on-the-agency claims here, they would not be relying on traditional state tort law which had predated the federal enactments in questions. On the contrary, the existence of these federal enactments is a critical element in their case. For the reasons stated above, we think this sort of litigation would exert an extraneous pull on the scheme established by Congress, and it is therefore pre-empted by that scheme." ( Id. at p. 353, 121 S.Ct. 1012.)[6] *1218 Quesada, supra, 62 Cal.4th 298, 195 Cal.Rptr.3d 505, 361 P.3d 868 is a contrasting case. In Quesada, the plaintiff alleged the defendant was selling conventionally grown produce under an organic label, and brought state law false advertising and unfair competition claims. ( Id. at pp. 303-304, 195 Cal.Rptr.3d 505, 361 P.3d 868.) The defendant argued these state law claims were preempted by the federal Organic Foods Production Act of 1990 ( 7 U.S.C. §§ 6501 - 6522 ; Organic Foods Act). ( Quesada, at p. 304, 195 Cal.Rptr.3d 505, 361 P.3d 868.) As in Buckman, the Quesada court considered whether a presumption against preemption applied. ( Quesada, at pp. 312-314, 195 Cal.Rptr.3d 505, 361 P.3d 868.) The court noted "[t]he regulation of food labeling to protect the public is quintessentially a matter of longstanding local concern" and "the federal government has assumed a more peripheral role and routinely left undisturbed local policy judgments about how best to protect consumers." ( Id. at p. 313, 195 Cal.Rptr.3d 505, 361 P.3d 868.) "Consequently, the presumption against preemption 'applies with particular force' where state consumer protection laws regulating deceptive food labeling are at issue." ( Id. at p. 314, 195 Cal.Rptr.3d 505, 361 P.3d 868.)
The California Supreme Court proceeded to consider the defendant's obstacle preemption argument. The court highlighted the express purposes of the Organic Foods Act: " 'to establish national standards governing the marketing of' " organic food, " 'to assure consumers that organically produced products meet a consistent standard,' " and " 'to facilitate interstate commerce in' " organic food. ( Quesada, supra, 62 Cal.4th at p. 316, 195 Cal.Rptr.3d 505, 361 P.3d 868.) The court found that "permitting state consumer fraud actions would advance, not impair, these goals. Substitution fraud, intentionally marketing products as organic that have been grown conventionally, undermines the assurances *116 the USDA Organic label is intended to provide. Conversely, the prosecution of such fraud, whether by public prosecutors where resources and state laws permit, or through civil suits by individuals or groups of consumers, can only serve to deter mislabeling and enhance consumer confidence. [Citation.] From the grower perspective too, anything that deters the few bad apples, the 'dishonest traders looking to cash in on the premium prices organic food commands' [citation], enhances the overall health of the interstate market and benefits those producers that play by the rules in processing and marketing their products. Private claims like those here are thus consistent with the Organic Foods Act's goals of reassuring consumers and enabling fair competition." ( Id. at pp. 316-317, 195 Cal.Rptr.3d 505, 361 P.3d 868, fn.omitted.)
B. AFI Legislation and Regulations
We turn now to the federal statutory and regulatory scheme governing the AFI program. The Assets for Independence Act (hereafter, AFI Act or the Act) was enacted in 1998 and codified as a note to *1219 42 United States Code section 604.[7] The express purpose of the Act is "to provide for the establishment of demonstration projects designed to determine-[¶] (1) the social, civic, psychological, and economic effects of providing to individuals and families with limited means an incentive to accumulate assets by saving a portion of their earned income; [¶] (2) the extent to which an asset-based policy that promotes saving for postsecondary education, homeownership, and microenterprise development may be used to enable individuals and families with limited means to increase their economic self-sufficiency; and [¶] (3) the extent to which an asset-based policy stabilizes and improves families and the community in which the families live." (AFI Act, § 403.)
To this end, the Act authorizes HHS to approve demonstration projects designed to help low-income, low-net worth individuals accumulate assets for specified purposes, including postsecondary education and buying a home. (AFI Act, §§ 404, 405, 408.) The demonstration projects may be administered by nonprofit organizations, state or local government agencies, tribal governments, or certain credit unions and financial institutions. (Id. , § 404.)
For approved projects, the grantee "shall establish a Reserve Fund" and deposit in it "all funds ... from any public or private source in connection with the demonstration project." (AFI Act, § 407(a), (b)(1)(A).)[8] HHS shall disburse the grants over the course of the five-year demonstration projects "in an amount not to exceed the lesser of-[¶] (1) the aggregate amount of funds committed as matching contributions from non-Federal public or private sector sources; or [¶] (2) $1,000,000." (Id. , § 406(b).) Each dollar an individual deposits up to $2,000 shall be matched by between $0.50 and $4 of nonfederal funds and an equal amount of federal AFI grant funds. (Id. , § 410(a)-(b).) The Act sets forth detailed requirements for individual saver eligibility and qualified uses of the matched deposit account funds. (Id. , §§ 404, 408.)
The Act requires grantees to submit annual progress reports including the *117 "number and characteristics" of individual savers, the amounts deposited and withdrawn, how configurations of the program and grantee organization impacted saver participation, and how the impact on participation varied among "different populations or communities." (AFI Act, § 412(a).) The Act further requires HHS to hire "an independent research organization to evaluate the demonstration projects conducted under [the Act], individually and as *1220 a group." (Id. , § 414(a).) The independent evaluation is to consider a number of factors including the demonstration projects' effects on savings behavior, savings rates, and rates of homeownership and postsecondary education, as well as the "economic, civic, psychological, and social effects of asset accumulation," and for all of these factors, how they vary among different populations or communities. (Id. , § 414(b)(1)-(4).) The evaluation must also consider "potential financial returns" to the federal government, and whether "a permanent program of individual development accounts should be established." (Id. , § 414(b)(5)-(6).)
The Act provides that grantees shall "have sole authority over the administration of the project. [HHS] may prescribe only such regulations or guidelines with respect to demonstration projects conducted under [the Act] as are necessary to ensure compliance with the approved applications and the requirements of [the Act]." (AFI Act, § 411.) However, this administrative authority is expressly subject to HHS's sanction authority set forth in the Act. (Id. , §§ 411, 413.) The Act provides that if HHS determines a grantee "is not operating a demonstration project in accordance with the entity's approved application ... or the requirements of [the Act] (and has not implemented any corrective recommendations directed by [HHS] ), [HHS] shall terminate such entity's authority to conduct the demonstration project," take control of the grantee's reserve fund, and attempt to identify another entity to take over the demonstration project. (Id., § 413.)
HHS has other sanctions available for the failure to comply with requirements regarding the reserve funds. AFI regulations provide that grantee reserve funds must comply with HHS's uniform administrative requirements. ( 45 C.F.R. § 1000.3.) The regulations setting forth these administrative requirements provide: "If a non-Federal entity fails to comply with Federal statutes, regulations, or the terms and conditions of a Federal award, the HHS awarding agency ... may impose additional conditions.... [or, if] noncompliance cannot be remedied by imposing additional conditions, the HHS awarding agency ... may take one or more of the following actions, as appropriate in the circumstances: [¶] (a) Temporarily withhold cash payments.... [¶] (b) Disallow (that is, deny both use of funds and any applicable matching credit for) all or part of the cost of the activity or action not in compliance. [¶] (c) Wholly or partly suspend (suspension of award activities) or terminate the Federal award. [¶] (d) Initiate suspension or debarment proceedings.... [¶] (e) Withhold further Federal awards for the project or program. [¶] (f) Take other remedies that may be legally available." ( 45 C.F.R. § 75.371.) One of the other legally available remedies for *1221 false representations to HHS is to seek federal criminal prosecution under 18 U.S.C. section 1001.[9] *118 C. Presumption Against Preemption
We turn first to whether the presumption against preemption applies in this case. As highlighted in Buckman , the inquiry is whether the state regulation occurs in " 'a field which the States have traditionally occupied.' " ( Buckman, supra, 531 U.S. at p. 347, 121 S.Ct. 1012.) The analysis hinges on how we characterize the area of regulation: is it the prosecution of theft and criminal fraud, which lies within the states' historic police powers, or is it "[p]olicing fraud against federal agencies ... [,] hardly 'a field which the States have traditionally occupied' " ( Buckman, at p. 347, 121 S.Ct. 1012 ).
For purposes of the presumption against preemption, Buckman characterized state law tort claims as claims involving "[p]olicing fraud against federal agencies," where the defendant's "dealings with the FDA were prompted by [a federal statute], and the very subject matter of [the defendant's] statements were dictated by that statute's provisions." ( Buckman, supra, 531 U.S. at pp. 347-348, 121 S.Ct. 1012.) Similarly, appellants' dealings with HHS were prompted by the AFI Act, and the subject matter of the Citibank letter was dictated by that statute's provisions.
Commonwealth's Motion to Appoint Counsel (3d Cir. 2015) 790 F.3d 457 ( Commonwealth's Motion ) is also instructive. In that case, a nonprofit organization providing federal defender services was representing capital prisoners in state post-conviction review proceedings. ( Id. at pp. 462-463.) In several such proceedings, the state attorney general asked the state Supreme Court to disqualify the federal defender organization from appearing absent federal court authorization. ( Id. at pp. 463-464.) "[T]he cited reason for disqualification was based on the organization's alleged misuse of federal grant funds to appear in state proceedings," specifically, grant funds authorized by the Criminal Justice Act, 18 United States Code § 3006A, and administered by the Administrative Office of the United States Courts (AO). ( Commonwealth's Motion, at pp. 461-462.) The state Supreme Court issued orders stating that, if federal grant funds were being used to fund the federal defender's appearance in the state proceedings, the federal *1222 defender should be disqualified. ( Id. at pp. 464-465.)[10] The federal defender removed the disqualification motions to federal court and argued, inter alia, that federal law preempted the motions. ( Id. at p. 461.)
The federal court of appeals considered whether the presumption against preemption applied. The state argued the authority for the removal was a state constitutional provision authorizing the state Supreme Court to prescribe rules governing the practice and procedure of the state courts. ( Commonwealth's Motion, supra, 790 F.3d at p. 475.) The court of appeals reasoned: "As a general matter, it is true that the States have a long history of regulating the conduct of lawyers, who are officers of the courts. [Citation.] But the impetus for the proceedings here is that the Federal Community Defender is allegedly applying its federal grant funds to purposes not authorized by the relevant federal statutes and grant terms. [Citation.] As explained above, these grants are paid under the *119 supervision of the AO, a federal agency within the Judicial Conference with regulatory control over the Federal Community Defender. '[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law.' [Citation.] Policing such relationships 'is hardly a field which the States have traditionally occupied,' and thus there can be no presumption against preemption here." ( Id. at p. 476.)
We find this case akin to Buckman and Commonwealth's Motion, and unlike Quesada. In Quesada, the state laws "regulat[ed] deceptive food labeling," which the California Supreme Court found to be "quintessentially a matter of longstanding local concern." ( Quesada, supra, 62 Cal.4th at pp. 313, 314, 195 Cal.Rptr.3d 505, 361 P.3d 868.) Here, the sole basis for the prosecutions was appellants' representation to HHS about the AFI reserve account, made pursuant to and as required by the AFI Act. (See Buckman, supra, 531 U.S. at pp. 347-348, 121 S.Ct. 1012.) The relationship between appellants and HHS "originates from, is governed by, and terminates according to federal law." ( Buckman, at p. 347, 121 S.Ct. 1012 ; Commonwealth's Motion, supra, 790 F.3d at p. 476.) Appellants' "dealings with [HHS] were prompted by the [AFI Act], and the very subject matter of [appellants'] statements were dictated by that statute's provisions." (See Buckman, at pp. 347-348, 121 S.Ct. 1012.) Policing such a relationship is not an area of historic state regulation, accordingly, no presumption against preemption applies.
*1223 D. Obstacle Preemption Analysis
We now return to obstacle preemption and consider whether the prosecution of counts 2 and 3 is preempted by the AFI Act. As discussed in part I.B, ante , the purpose of the AFI Act was to establish asset-building demonstration projects and determine the various effects and impacts of asset-based policies. (AFI Act, § 403.) We conclude that permitting state criminal prosecutions based on grantees' representations to HHS made pursuant to the AFI Act would undermine these Congressional objectives.
The analysis in Commonwealth's Motion, finding preemption of the state's attempt to disqualify the federal public defender's office for violating the terms of its federal grant, is instructive. " 'Sanctions are drawn not only to bar what they prohibit but to allow what they permit, and the inconsistency of sanctions [may] undermine[ ] the congressional calibration of force.' [Citation.] This is especially so when a federal agency is afforded the discretion to apply those sanctions or stay its hand. [Citations.] [¶] Here, Congress has delegated supervisory authority over [Criminal Justice Act] grants to the AO. The AO has the power to 'reduce, suspend, or terminate, or disallow payments ... as it deems appropriate' if the Federal Community Defender does not comply with the terms of its grants. [Citation.] But if the [state] could sanction noncompliance, the AO could be hindered in its ability to craft an appropriate response. ... After all, as the District Court noted ..., 'the [AO's] usual remedies, such as recoupment of distributed funds, are more consistent with the CJA's objectives because they mitigate the disruption to the existing attorney-client relationships.' [Citation.] Allowing the Commonwealth to attach consequences to the Federal Community Defender's relationship with the AO would 'exert an extraneous pull on the scheme established by Congress' in a manner that conflicts with federal objectives. Buckman, 531 U.S. at 353, 121 S.Ct. 1012." ( Commonwealth's Motion, supra, 790 F.3d at p. 477.) Similarly, *120 the AFI Act provides that if a grantee is not operating its AFI project in compliance with the Act and its grant, HHS may recommend corrective measures and, if those are not implemented, terminate the project. (AFI Act, § 413(a).) HHS can take additional sanction measures, including debarment or recommending federal criminal prosecution. If states could initiate their own criminal prosecutions, HHS "could be hindered in its ability to craft an appropriate response." ( Commonwealth's Motion, at p. 477.)
Significantly, the Act depends on grantees' interest in participating in the AFI program. The threat of state criminal prosecution could deter potential grantees from applying for an AFI grant. (See Buckman, supra, 531 U.S. at p. 350, 121 S.Ct. 1012 ["Would-be applicants may be discouraged from seeking [FDA] approval of devices with potentially beneficial off-label uses for fear that such use might expose the manufacturer or its associates (such as petitioner) to *1224 unpredictable civil liability."].) We note that the HHS employees testified at trial that the process of applying for an AFI grant was "extensive," "not easy," and "takes resources of the agency." They testified the AFI program was difficult to administer and involved unique, confusing rules. The asset-building work of an AFI program "is not very easy. Even if you have the money, doing it is not that easy" and requires a lot of hard work.
We find it notable that the only sanction for noncompliance set forth in the AFI Act itself is termination of the grantee's authority to conduct the demonstration project. (AFI Act, § 413(a).) It is also notable that the section of the Act setting forth sanctions includes detailed requirements that HHS attempt to identify another entity to operate the project and transfer the project to that entity. (AFI Act, § 413(b)(1)-(5).) This underscores Congress's purpose in enacting the AFI Act to conduct and support asset-building demonstration projects, and suggests Congress believed that punitive measures for noncompliance might often conflict with that purpose.[11]
Indeed, HHS's response to grantee noncompliance has conformed to this understanding. HHS employee Yeoman testified that when HHS becomes aware of problems with a grantee's administration of an AFI grant, "generally speaking, we sort of take the position of go and sin no more. That is, okay, you screwed up. ... Here's how you need to do it. Do it right from now on. ... [¶] We don't want to stop a program and stop the individuals from getting the benefit of it if we can find another way to get it right." If AFI grant money had been spent inappropriately, Yeoman testified, "[w]e would first figure out can we, can we make this right? It might, it might involve the grantee paying back funds, paying back money, into the grant from some other source...." Morgan similarly testified that if HHS learned a grantee drew down federal AFI grant money without matching nonfederal funds on deposit, "we would try our best to work with the grantee to help them be successful in correcting such a problem without having to do some disciplinary action. So, we would probably try and we would, you know, talk to our legal counsel, again, in the office of general counsel for HHS, and try to work it out with them, if we could," although "once a grant project period is over, ... it really would be difficult to *121 pursue any type of correction to that type of thing without a disallowance." While this testimony is not indicative of Congress's intent at the time the AFI Act was enacted, it lends supports to our assessment of that intent.
This obstacle-the potential of the state law to deter applicants critical to the federal law's purpose-was entirely absent in Quesada, where the *1225 California Supreme Court found that "permitting state consumer fraud actions would advance, not impair" the goals of federal statutes. ( Quesada, supra, 62 Cal.4th at p. 316, 195 Cal.Rptr.3d 505, 361 P.3d 868 [establishing national marketing standards for organic food and increase consumer confidence in organically-labeled food].)
The People cite several cases rejecting preemption challenges to state criminal prosecutions for fraud against the federal government. We find these cases distinguishable. Three involve prosecutions based on the defendants' theft of federal benefits. ( State v. Jones (Utah Ct.App. 1998) 958 P.2d 938, 939 [federal disability retirement benefits]; People v. Lewis (1998) 295 Ill.App.3d 587, 230 Ill.Dec. 438, 693 N.E.2d 916, 917 [federal unemployment benefits for railroad employees]; Commonwealth v. Morris (1990) 394 Pa.Super. 185, 575 A.2d 582, 583 [Social Security benefit checks].) The cases describe no Congressional purpose that would be hindered by state prosecutions. ( Jones, at p. 943 [the defendant "concedes that the State's prosecution creates no actual conflict with the administration of [the federal law]"]; Lewis, 230 Ill.Dec. 438, 693 N.E.2d at p. 920 ["we are confident that the State's prosecution of defendant for theft of federal unemployment benefits does not operate as an impediment to Congress's purposes and objectives in prohibiting benefits fraud"]; Morris, at p. 586 ["We conclude that the Social Security Act itself as well as its legislative history make clear that the federal government did not intend to dominate the field of public welfare to the exclusion of the states."].) Similarly, in a fourth case involving a state prosecution for forgery of federal income tax documents, "the defendant has not pointed to any actual conflict with federal law." ( State v. Radzvilowicz (1997) 47 Conn.App. 1, 703 A.2d 767, 788.)
In the two remaining cases relied on by the People, the defendants argued their state prosecutions were preempted by federal criminal statutes penalizing the same conduct. ( Carter v. Commonwealth (1997) 25 Va.App. 721, 492 S.E.2d 480, 480-481 [defendant convicted of cable television fraud; federal statute criminalized unauthorized reception of cable television service]; State v. McMurry (Ct.App. 1995) 184 Ariz. 447, 909 P.2d 1084, 1085-1086 [defendant convicted of forgery for possessing counterfeit $20 bills; federal statute criminalized possession of counterfeit tender].) Again, there was no indication of a Congressional purpose that would be hindered by the state prosecution; to the contrary, in both cases an express savings clause preserved the states' authority. ( Carter, at pp. 481-482 [savings clause encompassed state laws " 'regarding the unauthorized interception or reception of any cable service,' " and the state law "stands not as an obstacle to the accomplishment and execution of the full objectives of Congress, but as a *1226 supplement"]; McMurry, at p. 1086 ["Nothing in the federal statutes regarding counterfeiting ... indicates, much less expresses, an intent by the federal government to legislatively occupy the field as to the punishment of those who possess counterfeit tender, with an intent to defraud. In fact, 18 [United States Code section] 3231 declares a contrary intent by stating that '[n]othing in this title [18] shall be held to take away or impair the jurisdiction of the *122 courts of the several States under the laws thereof.' "].)
Finally, the People rely on remarks by the bill's author that the bill "recognizes the limits of government and the fact that many of our worst social problems will never be solved by government alone." (Remarks of Sen. Coats, 144 Cong. Rec. S11868 (Oct. 8, 1998).) The People argue this indicates Congress's intent to delegate responsibility to the local level and "permits no implication" that state prosecutions of grantees could be preempted. However, the remark was not limited to the federal government, and appears to be directed at local government as well. Moreover, the sentence quoted by the People was immediately followed by: "We are beginning to recognize that there are people and institutions, families, churches, synagogues, parishes, community volunteer organizations, faith-based charities, that are able to communicate societal ideals and restore individual hope, and we need to allow those organizations to compete to provide services, and we have done so in each of the programs I have described." (Ibid .) The full statement thus underscores a Congressional understanding that the success of the AFI Act depends on the willingness of organizations and entities to apply for AFI grants and become grantee organizations. The threat of state criminal prosecution could significantly dampen this willingness, thereby posing an obstacle to the objectives of the AFI Act. (See Buckman, supra, 531 U.S. at p. 350, 121 S.Ct. 1012.)[12]
We conclude the prosecutions of counts 2 and 3 were preempted by federal law. We emphasize the narrowness of our holding, which is limited to state law liability for grantees' representations to HHS made pursuant to the AFI Act. This holding does not extend to criminal liability for conduct by savers participating in the AFI program. It also does not include theft prosecutions where an employee of the grantee took the federal AFI funds for *1227 their own personal use (a circumstance not alleged here), as such a prosecution would not arise from the relationship between the grantee and HHS as governed by federal law.
E. Forfeiture of Preemption Claim as to Count 3
Finally, we turn to the People's argument that appellants forfeited their preemption claim as to count 3. Appellants concede they raised this argument in the trial court only as to counts 1 and 2, but contend preemption is not forfeitable.
We need not decide whether appellants' preemption argument can be forfeited because we exercise our discretion to excuse any forfeiture. The issue is one of law and does not involve any disputed facts. ( People v. Rosas (2010) 191 Cal.App.4th 107, 115, 119 Cal.Rptr.3d 74 ["appellate courts regularly use their discretion to entertain issues not raised at the trial level when those issues involve only questions of law based on undisputed facts" (italics omitted) ].) Moreover, the People were not prejudiced by any forfeiture: appellants preserved the identical claim as to other counts and the People point to no difference in the analysis involving count 3. (See *123 People v. Yeoman (2003) 31 Cal.4th 93, 118, 2 Cal.Rptr.3d 186, 72 P.3d 1166 ["[T]o consider the [forfeited] claim entails no unfairness to the parties, who had an opportunity to litigate the relevant facts and to apply the relevant legal standard in the trial court [on a properly raised and effectively identical claim]. Nor does it impose any additional burden on us, as the reviewing court." (fn. omitted) ].) Accordingly, we excuse any forfeiture on this issue as to count 3.
F. Conclusion
In sum, we find the prosecution of counts 2 and 3 preempted by federal law. We will reverse the convictions on those counts. This conclusion renders moot a number of appellants' additional arguments, which we need not and do not resolve. However, it does not impact Dillard's conviction on count 6, preparing false documentary evidence, and we consider Dillard's remaining arguments relevant to that count.
II.-IV.**
*1228 DISPOSITION
Appellants' convictions on counts 2 and 3 are reversed. The matter is remanded to the trial court for resentencing. The judgments are otherwise affirmed.
We concur.
JONES, P.J.
NEEDHAM, J.

All undesignated section references are to the Penal Code.

The parties presented evidence of emails and telephone calls leading up to this June 10 email; we omit these facts as unnecessary to our resolution of the appeal.

Dillard, Daniels, and Rahwanji all testified they believed the savers' deposits could be counted as "non-federal match funds." The combined individual saver accounts contained less than $200,000. Daniels testified he relied on Rahwanji to verify the amount before she signed the letter. Rahwanji testified she attempted to so verify but abandoned the cumbersome task, believing based on an "eyeball" assessment that the figures were about right.

Dillard testified she believed this use of the funds was permissible as long as all of the money was returned when the AFI grant closed out, and she intended to return the funds so used to the Citibank AFI reserve account. As noted above, the jury acquitted appellants of improperly using AFI funds.

" 'The categories of preemption are not "rigidly distinct." ' [Citations.] We and the United States Supreme Court have often identified only three species of preemption, grouping conflict preemption and obstacle preemption together in a single category. [Citations.] As conflict and obstacle preemption are analytically distinct and may rest on wholly different sources of constitutional authority, we treat them as separate categories here." (Viva! Intern. Voice for Animals v. Adidas Promotional Retail Operations, Inc. (2007) 41 Cal.4th 929, 935-936, fn. 3, 63 Cal.Rptr.3d 50, 162 P.3d 569 (Viva! ).)

Appellants also rely on two other United States Supreme Court cases. Arizona v. U.S. (2012) 567 U.S. 387, 132 S.Ct. 2492, 183 L.Ed.2d 351 was a field preemption case. (Id. at p. 401, 132 S.Ct. 2492.) The high court rejected the state's argument that the challenged law had "the same aim as federal law" because it "ignores the basic premise of field preemption-that States may not enter, in any respect, an area the Federal Government has reserved for itself." (Id. at p. 402, 132 S.Ct. 2492.) The court also noted the argument was "unpersuasive on its own terms. Permitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted. [Citations.] Were [the state law] to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." (Ibid. ) Wisconsin Dept. of Industry v. Gould Inc. (1986) 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223, involved the National Labor Relations Act (NLRA), which "largely displaced state regulation of industrial relations." (Id. at p. 286, 106 S.Ct. 1057.) The high court found a state law debarring repeat NLRA violators from state contracts "functions unambiguously as a supplemental sanction for violations of the NLRA," "conflicts with the [National Labor Relations] Board's comprehensive regulation of industrial relations," and "detracts from the 'integrated scheme of regulation' created by Congress." (Id. at p. 288-289, 106 S.Ct. 1057.)

(Pub. L. 105-285 (Oct. 27, 1998) 112 Stat. 2759, as amended by Pub. L. 106-554 (Dec. 21, 2000) 114 Stat. 2763; Pub. L. 107-110 (Jan. 8, 2002) 115 Stat. 1947; Pub. L. 114-95 (Dec. 10, 2015) 129 Stat. 2168.)

The Act excludes state and local government grantees from the requirement to establish a reserve fund. (AFI Act, § 407(a).) However, the Agency's AFI grant award obligated it to establish a reserve fund.

With exceptions not relevant here, "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully-[¶] (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; [¶] (2) makes any materially false, fictitious, or fraudulent statement or representation; or [¶] (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; [¶] shall be fined under this title, imprisoned not more than 5 years ..., or both." (18 U.S.C. § 1001.)

The federal defender claimed only private funds were used for work on state proceedings, unless that work was preparatory for a federal proceeding. (Commonwealth's Motion, supra, 790 F.3d at p. 463.)

The People argue that state theft prosecutions "can deter misuse of federal funds" and thus further the purpose of the AFI Act, but appellants were acquitted of misusing the AFI funds. The challenged prosecutions were based solely on appellants' misrepresentations to HHS.

The People also point to the AFI Act's section entitled "Local Control Over Demonstration Projects" (AFI Act, § 411), and argue it would be "incongruous to mandate local control but preclude local response to malfeasance." However, the local control referred to in the Act is the control of grantee organizations-not local government-and is expressly subject to HHS's sanction authority provided for in the Act. (AFI Act, § 411 ["A qualified entity [grantee] ... shall, subject to the [sanctions provision of the Act], have sole authority over the administration of the project."].)

See footnote *, ante .