Filed 2/16/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHARLES YEAGER-REIMAN,<br><br>    Defendant and Appellant. | B331175<br><br>(Los Angeles County<br>Super. Ct. No. BA464429) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael E. Pastor, Judge.  Affirmed.

Hickey & Chung and Brendan M. Hickey for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, James G. Root, Assistant Attorney General, Michael W. Whitaker and Gregory B. Wagner, Deputy Attorneys General, for Plaintiff and Respondent.

# I.    INTRODUCTION

Defendant Charles Yeager-Reiman pleaded guilty to misdemeanor grand theft.  (Pen. Code, § 487, subd. (a)[1].)  The trial court placed him on probation for two days under certain terms and conditions.  On appeal, defendant contends his prosecution was preempted by federal law because he was a veteran and his alleged offenses concerned the theft of benefits from the United States Department of Veterans Affairs (VA).  We affirm.

# II.    BACKGROUND

On April 2, 2018, the California Department of Justice filed a felony complaint charging defendant and others with conspiracy to commit grand theft, identity theft, forgery, making a false and fraudulent claim, and preparing false evidence (§ 182, subd. (a)) (count 1); grand theft of personal property (§ 487, subd. (a)) (count 2); and making false and fraudulent claims (§ 550, subd. (a)(5)) (count 5).

The complaint alleged that in 2011 and 2012, Amit Marshall, the owner, president, and director of the Alliance School of Trucking (Alliance) obtained approval from the California State Approving Agency for Veterans Education for Alliance to provide non-college degree trucking programs to veterans eligible for benefits under the "Post-9/11 GI Bill" (38 U.S.C., Pt. III, Ch. 33).  That approval authorized Alliance to receive tuition and other payments from the VA.  Marshall and

---

[1]    All further statutory references are to the Penal Code unless otherwise stated.

Alliance director Robert Waggoner falsely certified to the VA that they would truthfully report veteran students' enrollment status and attendance records and maintain current knowledge of VA rules and benefits.

Between October 1, 2011, and April 22, 2015, Marshall, Waggoner, and Alliance employee Aaron Solomona recruited and caused others to recruit eligible veterans to enroll in the approved Alliance trucking programs. Solomona told prospective students that together they could defraud the VA—students would not have to attend classes, but Alliance would report to the VA that they did, and each student would receive between $2,000 and $3,000 per month in benefits.

Between October 1, 2011, and April 22, 2015, Marshall, Waggoner, and Solomona provided and caused to be provided enrollment paperwork to veterans, including defendant, to fill out, and obtained information from the veterans to enable them to fill out paperwork on the veterans' behalf. Marshall, Waggoner, and Solomona submitted or caused to be submitted the recruited veterans' enrollment paperwork to the VA.

Between September 1, 2011, and April 22, 2015, Marshall, Waggoner, Solomona, and Sandor Greene created and caused to be created fraudulent student files for the purported students that contained false attendance records, false grades, and false certificates of completion. Through the completion of a VA form, Marshall and Waggoner falsely and fraudulently certified that defendant and/or other veteran students had attended classes at Alliance.

Between December 8, 2011, and April 22, 2015, as a direct result of their fraudulent scheme, Marshall, Waggoner, Solomona, Greene, and Ivanova Jimenez caused the VA to pay

3

Alliance approximately $2,351,658.19 in tuition and fees and approximately $1,957,715.89 in education benefits to veteran students, including defendant, who fraudulently claimed to have attended Alliance trucking programs.

Defendant moved to dismiss the complaint, in part on the ground that the prosecution was barred by federal preemption. The trial court denied the motion.

On May 2, 2019, defendant filed a petition for writ of prohibition in the trial court. The court denied the petition.

On June 13, 2019, defendant filed a petition for writ of prohibition in this court challenging the trial court's jurisdiction on federal preemption grounds. (See *Yeager-Reiman v. Superior Court of Los Angeles County* (July 19, 2019, B298320) [nonpub. order].) On July 12, 2019, we denied the petition because defendant had "not met his burden to establish that the People's prosecution of him is preempted." (*Ibid*.) On December 11, 2019, after further proceedings in this court and the Supreme Court (B301606, S257343), the Supreme Court denied defendant's petition for review (S259032).

On August 2, 2021, pursuant to a plea agreement, defendant pleaded guilty to count 1, a felony. As part of the plea agreement, the prosecution agreed to reduce the charge to a misdemeanor if defendant satisfied certain terms and conditions. On April 28, 2022, defendant, having satisfied those terms and conditions, pleaded guilty to misdemeanor grand theft.

## III. DISCUSSION

Defendant contends his prosecution was preempted by federal law—"field" and "obstacle" preemption—and the trial court was thus without jurisdiction to hear his case.[2] We disagree.

### A. *Standard of Review*

Because federal preemption presents a pure question of law, our standard of review is de novo. (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10.)

---

[2] The Attorney General argues we should dismiss defendant's appeal because he failed to obtain a certificate of probable cause as required by section 1237.5. We reject the argument. (*People v. Loera* (1984) 159 Cal.App.3d 992, 997–998 [defendant was not precluded from raising his jurisdiction claim "by his failure to secure a certificate of probable cause ordinarily required by section 1237.5"].)

The Attorney General further argues our denial of defendant's petition for writ of prohibition in *Yeager-Reiman v. Superior Court of Los Angeles County, supra*, B298320, is law of the case precluding defendant from raising his federal preemption argument on appeal. We disagree. Our order denying defendant's petition stated in full: "The court has read and considered the petition for writ of mandate filed June 13, 2019. The petition is denied. Petitioner has not met his burden to establish that the People's prosecution of him is preempted." "A short statement or citation explaining the basis for the summary denial [of a writ petition] does not transform the denial into a decision of a cause entitled to law of the case effect." (*Kowis v. Howard* (1992) 3 Cal.4th 888, 895.)

B.  *General Preemption Principles*

"""The supremacy clause of the United States Constitution establishes a constitutional choice-of-law rule, makes federal law paramount, and vests Congress with the power to preempt state law." [Citations.]  Similarly, federal agencies, acting pursuant to authorization from Congress, can issue regulations that override state requirements.  [Citations.]  Preemption is foremost a question of congressional intent:  did Congress, expressly or implicitly, seek to displace state law?' (*Quesada v. Herb Thyme Farms, Inc.* (2015) 62 Cal.4th 298, 307–308 (*Quesada*).)" (*Solus Industrial Innovations, LLC v. Superior Court* (2018) 4 Cal.5th 316, 331 (*Solus*).)

"Our Supreme Court has "'identified several species of preemption.'" ([*Solus*], *supra*, 4 Cal.5th at p. 332.)  'Express preemption occurs when Congress defines the extent to which its enactments preempt state law.  [Citation.]  Conflict preemption is found when it is impossible to comply with both state and federal law simultaneously.  [Citation.]  Obstacle preemption occurs when state law stands as an obstacle to the full accomplishment and execution of congressional objectives.  [Citation.]  Field preemption applies when federal regulation is comprehensive and leaves no room for state regulation.  [Citation.]' [Citation.]" (*People v. Salcido* (2019) 42 Cal.App.5th 529, 537 (*Salcido*).)

"Ordinarily, there is a presumption against preemption. ([*Solus*], *supra*, 4 Cal.5th at p. 332.)  'The presumption is founded on "respect for the States as 'independent sovereigns in our federal system'"; that respect requires courts "to assume that 'Congress does not cavalierly pre-empt state-law causes of action.'" [Citation.]  The strength of the presumption is

6

heightened in areas where the subject matter has been the long-standing subject of state regulation in the first instance; where federal law touches "a field that "'has been traditionally occupied by the States,'"'" the party seeking to show preemption "bear[s] the considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.'" [Citations.]' ([*Quesada, supra*,] 62 Cal.4th [at p.] 313.)" (*Salcido, supra*, 42 Cal.App.5th at pp. 537–538.)

"[T]here is a strong presumption against federal preemption when it comes to the exercise of historic police powers of the states. [Citations.] That presumption will not be overcome absent a clear and manifest congressional purpose. [Citation.]" (*People v. Boultinghouse* (2005) 134 Cal.App.4th 619, 625.) The prosecution of theft and criminal fraud is within the state's historic police powers. (*People v. Dillard* (2018) 21 Cal.App.5th 1205, 1221 (*Dillard*).)

C.     *Field Preemption*

Field preemption exists "when 'Congress . . . intended "to foreclose any state regulation in the area," irrespective of whether state law is consistent or inconsistent with "federal standards." [Citation.] In such situations, Congress has forbidden the State to take action in the field that the federal statute pre-empts.' [Citation.]" (*Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 704–705.)

Defendant states that in enacting the Post-9/11 GI Bill Congress declared, "'Educational assistance for veterans helps reduce the costs of war, assist veterans in readjusting to civilian life after wartime service, and boost the United States economy,

7

and has a positive effect on recruitment for the Armed Forces.'" (Quoting Post-9/11 Veterans Educational Assistance Act of 2008 (Pub.L. No. 110–252, § 5002(3) (June 30, 2008), 122 Stat. 2323.) He argues field preemption applies because "Congress sought to 'occupy the field' by placing the administration of the [Post-9/11 G.I.] Bill within the national security realm, thus preempting any state from disrupting that federal administration . . . ."

According to defendant, Congress implemented a statutory and regulatory framework that addresses false statements, misrepresentations, and fraud against the VA in the Post-9/11 G.I. Bill, but that also disfavors criminal prosecution of veterans, reserving the right to pursue such prosecutions to the Attorney General of the United States. That is, the framework is designed to meet the need for fraud deterrence and protecting the public purse while not chilling veterans' exercise of their legal benefits or jeopardizing the national defense by reducing military recruitment or increasing the costs of war.

In support of his argument, defendant relies on 38 Code of Federal Regulations (C.F.R.) parts 21.9740(a) (2024) and 21.4006 (2024) and title 38 United States Code (U.S.C.) section 3690(d) which, he contends, authorize the VA to report potentially criminal false statements to the Attorney General of the United States but not to the Attorney General of the state where the fraud took place.

38 C.F.R. part 21.9740(a) provides:

"Eligible individual. Payments may not be based on false or misleading statements, claims or reports. VA will apply the provisions of §§ 21.4006 and 21.4007 to any individual who submits false or misleading claims, statements, or reports in connection with benefits payable under 38 U.S.C. chapter 33 in

8

the same manner as they are applied to people who make similar false or misleading claims for benefits payable under 38 U.S.C. chapter 36."

38 C.F.R. part 21.4006(a) provides:

"Payments may not be based on false statements. Except as provided in this section payments may not be authorized based on a claim where it is found that the school or any person has willfully submitted a false or misleading claim, or that the veteran or eligible person with the complicity of the school or other person has submitted such a claim. A complete report of the facts will be made to the *State approving agency, and if in order to the Attorney General of the United States.*" (Italics added.)

Title 38 U.S.C. section 3690(d) provides:

"**False or misleading statements.** Whenever the Secretary [of the VA] finds that an educational institution has willfully submitted a false or misleading claim, or that a veteran or person, with the complicity of an educational institution, has submitted such a claim, the Secretary shall make a complete report of the facts of the case to the *appropriate State approving agency and, where deemed advisable, to the Attorney General of the United States* for appropriate action." (Italics added.)

None of these provisions contains language that suggests exclusivity or supports the assertion that Congress intended to occupy the field of criminal prosecution of veterans in connection with the theft of veterans' education benefits. Instead, those provisions state that the VA or the Secretary will report fraudulent statements to "the appropriate State approving agency," or to "the Attorney General of the United States." Although these provisions do not refer to the relevant state's

9

attorney general, they also do not contain language precluding the VA or the Secretary from reporting to the state's attorney general.  In the absence of clear and manifest statutory language indicating Congress intended federal remedies to occupy the field, there is no reason to find such exclusivity.  (*Jevne v. Superior Court* (2005) 35 Cal.4th 935, 949 ["'Where . . . the field which Congress is said to have pre-empted' includes areas that have 'been traditionally occupied by the States,' congressional intent to supersede state laws must be "'clear and manifest"'"].)

Accordingly, field preemption did not deprive the trial court of jurisdiction to hear defendant's case.

D.    *Obstacle Preemption*

Obstacle preemption "requires proof Congress had particular purposes and objectives in mind, a demonstration that leaving state law in place would compromise those objectives, and reason to discount the possibility the Congress that enacted the legislation was aware of the background tapestry of state law and content to let that law remain as it was." (*Quesada, supra*, 62 Cal.4th at p. 312.)  Defendant contends obstacle preemption applies because the purpose of the Post-9/11 GI Bill is to help veterans, and any effort by the state to prosecute veterans for failing to comply with the bill's requirements will interfere with the bill's purpose.

Defendant asserts that 38 C.F.R. parts 21.4007 and 3.900 et seq. and title 38 U.S.C. section 6103(d) "authorize the termination of benefits of a veteran or service member for committing fraud, but they create strict limitations that protect

10

the benefits of veterans *who have committed fraud against the VA so long as they reside in a U.S. State.*"

38 C.F.R. part 21.4007 provides:

"The rights of a veteran or eligible person to receive educational assistance allowance or special training allowance are subject to forfeiture under the provisions of §§ 3.900, 3.901 (except paragraph (c)), 3.902 (except paragraph (c)), 3.903, 3.904, 3.905 and 19.2 of this chapter."

38 C.F.R. part 3.901(d) provides, in pertinent part:

"[F]orfeiture by reason of fraud may be declared only  [¶] (1) Where the person was not residing or domiciled in a State . . . at the time of commission of the fraudulent act; or  [¶]  (2) Where the person ceased to be a resident of or domiciled in a State . . . before expiration of the period during which criminal prosecution could be instituted; or  [¶]  (3) The fraudulent act was committed in the Philippine Islands.  [¶]  Where the veteran's rights have been forfeited, no part of his or her benefit may be paid to his or her dependents."

Fraud, within the meaning of 38 C.F.R. part 3.901(d), is defined as:

"An act committed when a person knowingly makes or causes to be made or conspires, combines, aids, or assists in, agrees to, arranges for, or in any way procures the making or presentation of a false or fraudulent affidavit, declaration, certificate, statement, voucher, or paper, concerning any claim for benefits under any of the laws administered by the Department of Veterans Affairs (except laws relating to insurance benefits)." (38 C.F.R. § 3.901(a).)

11

Title 38 U.S.C. section 6103(d)(1) provides, in pertinent part:

"[N]o forfeiture of benefits may be imposed under this section or section 6104 of this title upon any individual who was a resident of, or domiciled in, a State at the time the act or acts occurred on account of which benefits would, but not for this subsection, be forfeited unless such individual ceases to be a resident of, or domiciled in, a State before the expiration of the period during which criminal prosecution could be instituted."

The provisions on which defendant relies show that Congress intended to limit the forfeiture of veterans' benefits. They do not support the assertion that Congress intended that states be precluded from prosecuting veterans for the theft of veterans' education benefits. And, they do not suggest that a veteran's forfeiture of benefits is a punishment for a criminal offense that bars further criminal prosecution. (See, e.g., *United States v. Roberts* (7th Cir. 2008) 534 F.3d 560, 568 [administrative VA proceedings are independent of criminal prosecution].)

Defendant further asserts that title 38 U.S.C. section 6108 demonstrates "Congress' clear intent that the authority for prosecution of fraud against the VA shall exclusively rest with the U.S. Attorney General and the ***Federal Courts,*** and Congress *specifically cautions against criminal punishment of veterans for benefits fraud by authorizing restitution in lieu of any other penalty in those cases.*"  Title 38 U.S.C. section 6108 provides:

"(a)  Any Federal court, when sentencing a defendant convicted of an offense arising from the misuse of benefits under this title, may order, in addition to or in lieu of any other penalty

12

authorized by law, that the defendant make restitution to the Department. [¶] (b) Sections 3612, 3663, and 3664 of title 18 shall apply with respect to the issuance and enforcement of orders of restitution under subsection (a). In so applying those sections, the Department shall be considered the victim."

Although title 38 U.S.C. section 6108 provides a federal remedy for the misuse of veterans' benefits, it does not contain any language prohibiting states from prosecuting veterans for the theft of veterans' education benefits.

Defendant also contends that 38 C.F.R. part 21.9695(b)(3) "demonstrates Congress' intent to place blame (and punishment) for educational benefits fraud at the feet of unscrupulous educational institutions rather than the veterans they enlist." Part 21.9695(b)(3) provides:

"The amount of the overpayment of educational assistance paid to the eligible individual, or paid to the institution of higher learning on behalf of the eligible individual, constitutes a liability of the institution of higher learning if VA determines that the overpayment is the result of willful or negligent— [¶] (i) False certification by the institution of higher learning; or [¶] (ii) Failure to certify excessive absences from a course, discontinuance of a course, or interruption of a course by the eligible individual."

The plain reading of 38 C.F.R. part 21.9695(b)(3) is that if the VA determines there is an overpayment due to willful or negligent false certification by an institution of higher learning, the higher learning institution is liable for the overpayment. This part does not support the assertion that Congress intended to preclude state criminal prosecution of veterans for the theft of veterans' education benefits. Rather, title 38 U.S.C section

13

3685(e)(2) states that when veterans are liable for overpayment, neither section 3685 nor "any other provision of this title shall be construed as . . . precluding the imposition of any civil or criminal liability under this title *or any other law*." (Italics added.) Section 3685(e)(2) supports the proposition that Congress recognized that a veteran may be prosecuted under state law.

Moreover, the assertion that Congress only intended to impose criminal punishment on educational institutions is undermined by title 38 U.S.C. section 6102, which provides:

"(a) Any person entitled to monetary benefits under any of the laws administered by the Secretary whose right to payment thereof ceases upon the happening of any contingency, who thereafter fraudulently accepts any such payment, shall be fined in accordance with title 18, or imprisoned not more than one year, or both. [¶] (b) Whoever obtains or receives any money or check under any of the laws administered by the Secretary without being entitled to it, and with intent to defraud the United States or any beneficiary of the United States, shall be fined in accordance with Title 18, or imprisoned not more than one year, or both."

We also are not persuaded by defendant's contention that this case is "indistinguishable" from *Dillard, supra*, 21 Cal.App.5th 1205, in which the Court of Appeal held that state law prosecutions based on fraud against a federal agency were barred by obstacle preemption. In *Dillard*, the United States Department of Health and Human Services (HHS) awarded a grant from its Assets for Independence (AFI) program to the Associated Community Action Program (ACAP), an anti-poverty agency. The purpose of such grants was to help low-income people (savers) build assets. When the defendants, ACAP's

14

executive director and an administrative assistant, fraudulently induced HHS to transfer AFI grant funds to ACAP, the state prosecuted the defendants for state law violations—grand theft by false pretenses (§ 487, subd. (a)) and making a false account of public moneys (§ 424, subd. (a)(3)). A jury convicted the defendants, and they appealed. (*Dillard, supra*, 21 Cal.App.5th at pp. 1209–1213.)

The Court of Appeal reversed the defendants' convictions, holding that the state prosecutions were barred by obstacle preemption. (*Dillard, supra*, 21 Cal.App.5th at pp. 1223–1228.) It emphasized, however, the "narrowness" of its holding, limiting it to "state law liability for grantees' representations to HHS made pursuant to the AFI Act."[3] (*Id.* at p. 1226.) The court explained that its holding did "not extend to criminal liability for conduct by savers participating in the AFI program"—i.e., to the low-income people the program was designed to aid. (*Ibid.*) Here, defendant, a veteran whom the Post-9/11 GI Bill was designed to aid, is akin to a saver under the AFI program whom the court in *Dillard* expressly did not include in its obstacle preemption holding. Accordingly, *Dillard* works against and does not advance defendant's obstacle preemption contention.

More instructive is *Quesada, supra*, 62 Cal.4th 298. There, the plaintiff brought a class action alleging the defendant intentionally mislabeled produce as organic. (*Id.* at p. 304.) At issue was whether the plaintiff's action was an obstacle to the accomplishment of the purposes and objectives of the Organic Foods Act and therefore preempted. (*Id.* at p. 315.)

---

[3] The AFI Act, "enacted in 1998 and codified as a note to 42 [U.S.C.] section 604," was the federal statutory and regulatory scheme governing the AFI program. (*Id.* at pp. 1218–1219.)

15

Quoting from the Organic Foods Act, our Supreme Court identified Congress's express intentions as follows: "'It is the purpose of this chapter—  [¶]  (1) to establish national standards governing the marketing of certain agricultural products as organically produced products;  [¶]  (2) to assure consumers that organically produced products meet a consistent standard; and [¶]  (3) to facilitate interstate commerce in fresh and processed food that is organically produced.'" (*Quesada, supra*, 62 Cal.4th at p. 316.)  The court explained that a "uniform national standard for marketing organic produce serves to boost consumer confidence that an 'organic' label guarantees compliance with particular practices, and also deters intentional mislabeling, 'so that consumers are sure to get what they pay for.'  [Citation.]  In turn, uniform standards 'provide a level playing field' for organic growers, allowing them to effectively market their products across state lines by eliminating conflicting regulatory regimes. [Citation.]  Standards that enhance consumer confidence in meaningful labels and reduce the distribution network's reluctance to carry organic products may increase both supply and demand and thereby promote organic interstate commerce. [Citation.]" (*Ibid.*)  The court held that "permitting state consumer fraud actions would advance, not impair, these goals . . . [by] deter[ing] mislabeling and enhanc[ing] consumer confidence." (*Id.* at pp. 316–317; see also *id.* at p. 303 ["a central purpose behind adopting a clear national definition of organic production was to permit consumers to rely on organic labels and curtail fraud [and] state lawsuits alleging intentional organic mislabeling promote, rather than hinder, Congress's purposes and objectives"].)

Here, defendant notes that the purpose of the Post-9/11 GI Bill is to "help veterans."  Rather than hinder that purpose, the state prosecution of persons who steal veterans' education benefits, including veterans, promotes Congress's purposes and objectives by preserving funds for veterans benefits through deterrence.  (See *Quesada, supra*, 62 Cal.4th at pp. 303, 316–317.)

Accordingly, obstacle preemption did not deprive the trial court of jurisdiction to hear defendant's case.

## IV.   DISPOSITION

The judgment is affirmed.


KIM, J.


We concur:



RUBIN, P. J.



BAKER, J.